JOSEPH R. INGERSOLL & *al. versus* JOHN BARKER.

Fraud is, almost always, a matter of inference from circumstances. Direct proof of it can seldom be expected. Concealment and disguise are often essential ingredients in it. It consists in intention, which if nefarious, will not be avowed; still it must be proved; and the question is, how shall it be proved. The answer is, by circumstantial evidence. A resort can be had to none other. The demeanor of the party implicated; the nature, tendency and effect of his acts, are to be carefully examined. A train of circumstances, sometimes more and sometimes less intimately connected with the particular act to be proved, may be presented, from which inferences may be drawn as to the object and design of the person charged with having committed the fraud.

If one obtain goods by means of fraudulent representations, and then assign them for the benefit of his creditors, the assignee not being himself a creditor, and no creditor having accepted the assignment when the assignee was fully notified of the fraud, the property cannot then be regarded otherwise than as virtually in the hands of the assignor and perpetrator of the fraud; and no rights can be subsequently acquired by any of his creditors by assenting to the assignment, adverse to him from whom the goods were fraudulently obtained.

THIS was an action of trover for 355 mill logs, alleged to have been converted by the defendant on July 15, 1839.

It was admitted by the defendant that John Black was the authorized agent of the plaintiffs.

Elijah L. Hamlin, called by the plaintiffs, testified that he was the agent of the plaintiffs, employed by Black, to obtain a settlement with Stephen S. Crosby for the logs, which had been cut by his men the preceding winter on land of the plaintiffs; that he called on him with a letter from Black containing an account of the logs, the price and quantity, and informed Crosby, that he was authorized to settle with him; that he and Crosby agreed where the logs were cut, and that the plaintiffs had before consented to retain a lien merely upon them as security for the stumpage, and the same were mixed with other logs of Crosby. The counsel for the defendant here made an objection to the admissions of Crosby, and the witness then proceeded to state what was said afterwards in a conversation between him and the defendant, Crosby being present, by which it appeared that the defendant was made ac-

quainted with the said admissions of Crosby. The witness stated, that after his first conversation with Crosby, he called upon him again on the 11th of June, 1839, and then relinquished the plaintiffs' claim to the logs in question by taking Crosby's note for the amount, in the number and quantity and price as mentioned in the writ, by reason of certain representations which Crosby made to him at the time, of his solvency, the amount of his property, his freedom from embarassment, his doing a snug business all within his own means, his not being in the habit of asking indorsers or indorsing for others, having a large surplus of property after paying every liability against him, and on request made, said he was not deceiving him, and many other facts stated by the witness, tending to show that Crosby represented himself to be possessed of much property; that the witness not knowing the situation of Crosby was induced to take his note payable in three months for the amount, and discharged the lien of the plaintiffs upon the logs; that on the 15th of July, 1839, having heard of the failure of Crosby, he called on the defendant, who informed him, that Crosby had assigned all his property to him for the benefit of his creditors; that the witness informed the defendant in what manner the logs were obtained, and the lien given up, and gave the defendant a history of the whole affair, and of Crosby's representations; and in the presence of Crosby recapitulated all the facts attending the sale; and thereupon demanded of the defendant the logs as the agent of the plaintiffs; that the defendant said he knew nothing about it and referred him to his attorney; that he called on the attorney and saw the assignment from Crosby to the defendant, and it was then signed only by Crosby and the defendant as assignee, which now appears thereon; that the defendant on being inquired of where the logs were, said they were at Milford, unsawed, and Crosby, in the presence of defendant, repeated it, and at the same time Crosby told the defendant that the logs inquired after by the witness were the logs purchased by him; witness told defendant, that the logs were the property of the plaintiffs; that witness and Crosby at that time agreed about all the facts as stat-

ed by the witness, and they differed only concerning the giving up of the logs ; and no consent was given that the logs should be given up.

It was admitted that Crosby's liabilities were $27,790. The witness further testified, that he had since called on the defendant and he said that Crosby's property would pay but a few cents on a dollar.

The assignment was produced in the case and referred to. The note taken from Crosby was tendered to the defendant's counsel and was put on the files of the Court by the plaintiffs' counsel for the benefit of Crosby or the defendant, it having been refused by the defendant's counsel. There was no evidence that it had ever been tendered before. The plaintiffs then offered to show, that goods were obtained by Crosby, about the time of his obtaining the logs in question, of others by false and fraudulent representations. This was objected to, but TENNEY J. presiding at the trial, allowed it. Harvey Pond and Ephraim Moulton were called by the plaintiffs, and their testimony tended to show that they had sold Crosby goods by reason of representations made by him ; and they offered to prove that the representations made to Pond were in February or March, 1839, and those to Moulton in Oct. 1838. This was objected to by the counsel for the defendant, but admitted by the Judge, they all having relation to his wants in order to carry on his lumber operations of 1839. And they said they should not have given him credit, but for his representations, and Moulton said those representations influenced him to let him have goods after Dec. 1838. Evidence was introduced tending to show Crosby's great indebtedness at the time of his representations to Hamlin, and also to the other witnesses, though not to the extent at the time he made them to the two last, as to Hamlin. The falsehood of his statements at the time he obtained the logs and the goods sold to him by others, and that he was then an embarrassed man, that he did obtain indorsers on his paper at the bank, and that he had mortgaged some of his real estate and household furniture, which mortgages were undischarged when he obtained the logs,

were stated by witnesses. The defendant called Crosby as a witness, whose testimony did not essentially contradict that of the other witnesses, but in some respects confirmed it, stating that he had given mortgages of real and personal property before that time, but when the negotiation took place with Hamlin it did not occur to him that such was the fact; and his testimony tended to show that he was ignorant of his real condition; that he had met with losses about that time and soon after; that his paper, which he thought he had provided for, was returned protested, which impaired the confidence of his friends in his ability to pay; and that in various ways he was grossly disappointed in his anticipations.

The counsel for the plaintiffs inquired of Harvey Pond the value of certain demands which had belonged to Crosby, and had been shown to Hamlin by the attorney of the defendant, on his being referred to him by the defendant, but which had been put into the assignment as Schedule B. This inquiry was objected to, but was allowed to be put by the Judge presiding. The counsel for the plaintiffs offered also to show that Crosby made false representations to said Pond in obtaining his name on a note to the bank on the 29th of May, 1839. This was objected to, but received. The defendant's counsel proposed to ask a witness called by the plaintiffs, who had become a party to the assignment, if he should have become a party, had he known that the amount of property demanded in this suit was to have been taken out. This was objected to by the plaintiffs' counsel and ruled out.

It was contended by the defendant's counsel, that this action could not be maintained, because the logs were mixed with others to which the plaintiffs had no title, and they could not be distinguished and separated; that as the property passed into the hands of the defendant without the knowledge of the creditors, who became the third party to the assignment, the plaintiffs could not maintain this action, even if the fraud of Crosby was satisfactorily proved; and that the action could not be maintained, because the plaintiffs had not returned, or offered to return, the note of Crosby till the time of trial.

On the foregoing evidence TENNEY J. presiding at the trial, instructed the jury, that the plaintiffs must prove the property to have been once theirs; and that the admissions of the defendant, and the statements of Crosby made in the presence of the defendant were evidence to this point. That this action could be maintained, even if the logs were so mixed with others of Crosby's that they could not be distinguished and separated, if they were satisfied, that they were the property of the plaintiffs. That this action could be maintained, notwithstanding the property had passed into the hands of the defendant, if he was notified of the facts, and the property was demanded and refused before the third party had come into the assignment, provided the plaintiffs could recover on other grounds. That it was not necessary for the maintenance of this action, that the note should be offered before the trial. That this action could be maintained, if Crosby had obtained the property by fraudulent representations, and the defendant had been notified thereof and the property demanded before the creditor's rights had attached, and that the latter could not be till they were parties to the assignment. That before the creditors had become parties to the assignment the property would be situated in the same manner as though it were in Crosby's hands. That in order to obtain a verdict, the plaintiffs must satisfy the jury, that the property was obtained by Crosby by representations which were false, known by him at the time to be false, made with a design to deceive and to obtain the property, and that the agent of the plaintiffs was thereby deceived. That if Crosby made false representations, and known by him to be false, the intention would be left to the jury, and intention to deceive would, as a matter of fact, be implied, unless there were facts and circumstances in the case to rebut such implication. That if Crosby was seriously called on by Hamlin to state the true condition of his affairs, and cautioned not to deceive him or himself, and Crosby represented his affairs to be prosperous and that he was a man of property, free from embarrassment, and he said this without giving himself time to reflect, when by reflecting he could have given a different ac-

count, and this want of reflection was through an indifference whether he spoke true or false, it was in effect making statements known to be false. And that if the logs were the property of the plaintiffs, if they were parted with by fraudulent representations of Crosby, if they were demanded by Hamlin, and refused before the assignment was executed by the third party, a conversion was made out, and their verdict would be for the plaintiffs.

The verdict was for the plaintiffs. If any of the rulings and instructions of the Judge were erroneous, the verdict was to be set aside.

*Moody* argued for the defendant, and cited 1 Stark. Ev. 140; 1 Phil. Ev. 117, 138; *Everett* v. *Wolcott*, 15 Pick. 97; *Buffington* v. *Gerrish*, 15 Mass. R. 156; *Gilbert* v. *Hudson*, 4 Greenl. 347; *Clark* v. *Flint*, 22 Pick. 231.

*Hobbs* argued for the plaintiffs, and cited *McKenney* v. *Dingley*, 4 Greenl. 172; *Seaver* v. *Dingley*, ib. 306; *Rowley* v. *Bigelow*, 12 Pick. 307; *Howe* v. *Reed*, 3 Fairf. 515; *Hawes* v. *Dingley*, 17 Maine R. 341; *Tryon* v. *Whitmarsh*, 1 Metc. 1; *Clark* v. *Flint*, 22 Pick. 231; *Thurston* v. *Blanchard*, ib. 18; *the Watchman*, 1 Ware, 232.

The opinion of the Court was drawn up by

WHITMAN C. J. — We are unable to see wherein the rulings of the Judge, who presided at the trial of this cause, or his instructions to the jury were justly exceptionable. Fraud is, almost always, a matter of inference from circumstances. Direct proof of it can seldom be expected. Concealment and disguise are often essential ingredients in it. It consists in intention, which, if nefarious, will not be avowed; still it must be proved; and the question is, how shall it be proved. The answer is, by circumstantial evidence. A resort can be had to none other. The demeanor of the party implicated; the nature, tendency and effect of his acts, are to be carefully examined. A train of circumstances, sometimes more and sometimes less intimately connected with the fraudulent act to be

proved, may be presented, from which inferences may be drawn as to the object and design of the accused.

Hence, to ascertain whether a person has passed counterfeit money, with an intention to defraud, we inquire, whether he has shortly before and afterwards passed off other similar money ; and whether in any such instance he was given to understand that it was counterfeit ; in this way making it evident that he must have known its falsity, and evincing a design to commit a fraud. A similar course of procedure has repeatedly been held applicable in cases in which goods have been obtained by false pretences. The case at bar was clearly of that character ; and we do not discern that the Judge, in the trial of it, admitted proof, other than might fairly be allowed according to precedent, under the peculiar circumstances of the case.

It is objected, that the property in question had vested in the defendant as assignee for the benefit of creditors, before he could have had knowledge of any such fraud; and in argument, although it does not appear in the case, it is urged, that the defendant was also a creditor ; and therefore must be deemed to have executed the assignment as such, as well as in the character of an assignee. But if it had appeared, that the defendant was in the condition of a creditor, as well as of an assignee ; or if it had appeared that other creditors had assented to the assignment, before they were notified of the fraud here set up, it is at least questionable whether it would have been of any avail against the plaintiffs ; especially as it is not presumable that they had become such after the fraudulent sale. If the property had been attached at the suit of any one of the creditors, so circumstanced, it is very clear that it could not have been held against the claim of the plaintiffs. *Buffington & al.* v. *Gerrish & al.* 15 Mass. R. 156.

But however this may be, it not appearing that the defendant was a creditor, and no other person, in the character of a creditor having accepted of the assignment, when the defendant was fully notified of the fraud practised upon the plaintiffs, the property could not then be regarded otherwise than virtually in the hands of Crosby, the assignor and perpetrator of the

fraud ; and no rights could be subsequently acquired by any of his creditors, by assenting to the assignment, adverse to those of the plaintiffs. And, besides, if the defendant were a creditor, and any lien upon the property assigned were created by his acceptance of the assignment as such, it does not appear that the property assigned, other than that claimed by the plaintiffs, would not have been amply sufficient for his indemnity. So that, in any just view of the case, as presented to us, we cannot come to the conclusion that the verdict ought to be set aside.

*Judgment on the verdict.*