HARRIET E. FROST, and others, in Equity,

*vs.*

FREDERICK S. WALLS, and another.

Knox.    Opinion December 26, 1899.

*Equity. Law. Laches. Fraud.*

Fraud is never to be presumed. Where many years have elapsed, and parties and witnesses are dead, and important papers are lost, the proof of fraud should be full, clear and convincing. *Held;* that the complainants have failed to furnish such proof in this case.

Complainants in equity may fairly be barred by laches.

Where a complainant in equity is not in possession he cannot test defects or flaws in a defendant's title. It is not the business of equity to try titles, and put one party out and another in.

*Held;* that so far as the validity of the defendant's title in this case is affected by illegality in the appointment of a guardian, from whom the defendants' title is deraigned, such question should be tried in an action at law.

ON REPORT.

Bill in equity, heard on bill, answer and proofs.

The case is stated in the opinion.

*J. H. Montgomery*, for plaintiffs.

*J. E. Moore*, for defendants.

SITTING: EMERY, HASKELL, WISWELL, STROUT, SAVAGE, JJ. FOGLER, J., having been of counsel, did not sit.

SAVAGE, J. This case is reported to the law court on bill, answer and proof.

The complainants are the children and heirs at law of James McComiskey, a resident of Nova Scotia, who died intestate in 1874, leaving real estate in Vinal Haven in this state. In October, 1875, upon a petition which purported to be signed by the mother of the complainants, Moses Webster was appointed their guardian. It was alleged in the petition that they were residents of Nova Scotia, but that they were seized of real estate in the county of Knox. In the same year, 1875, the guardian obtained from the probate court license to sell the real estate for an alleged advantageous offer of four hundred dollars. Under this license, the guardian conveyed the interest of the wards in the estate to one John S. Ingerson, June 26, 1876. Ingerson conveyed a portion of the land to Lucy A. Miller, a daughter of Moses Webster, July 12, 1876. Subsequently, at different times in 1876, 1877 and 1878, Ingerson conveyed three separate parcels of the land to Moses Webster. In January, 1880, he conveyed the remainder to one Wharff; and in August of the same year, Wharff conveyed to Webster. Webster died in 1887, and the defendants are his executors, and one of them, Walls, is his residuary devisee. All the real estate in question, except the portion conveyed to Lucy A. Miller, is now in the possession of Walls, and claimed by him as residuary devisee. The complainants have never been in possession. The present owner of the portion conveyed to Lucy A. Miller in 1876 has not been made a party to the bill, so that if the bill is maintainable against these defendants, it must be sent

back for amendment, to diminish the description of the land claimed by so much as was conveyed to Mrs. Miller. But we think the bill is not maintainable.

The gravamen of the complainants' charges is found in paragraph four of the bill, which is as follows: "And the plaintiffs say that the said Moses Webster was never their legally appointed guardian; that he never invested the proceeds of said sale as aforesaid for them, so far as they know, except in the repurchase of said real estate; that said conveyance of said premises by said Webster to said Ingerson, and the reconveyance of the same from said Ingerson to him were each in fraud of the plaintiffs; that said Webster had no right to act as their guardian in the sale and conveyance of said real estate to the said Ingerson, which was well known to the said Ingerson; that the plaintiffs never knew that the said Webster was their guardian, or that he claimed to be such, or that said premises had been conveyed by him, and to him as aforesaid, until within the year last past; that it is within the year last past that they knew of the estate of their father, the late James McComiskey, in said premises; that said Webster never settled any account of his said guardianship in his lifetime, nor have his said executors since his decease."

The charges are vague and indefinite,—too much so; but under the circumstances of the case, we think it proper to consider them in the light of the evidence. The complainants claim that the signature of their mother to the petition for the appointment of a guardian for them is a forgery, and that the appointment was therefore illegal and void. They also claim that it was a fraud upon them. They say that the appointment of Mr. Webster as guardian was a part of a fraudulent scheme on his part to obtain title to at least a part of these premises which they say he desired: that he was thereby enabled to convey title to Ingerson, who, in pursuance of his scheme, conveyed back to him such portions as he wished. And for further claim, they urge that even if the appointment of Mr. Webster as guardian was valid and unimpeachable, still the conveyance to Ingerson and the reconveyance to Webster were intended to be, and were, really but one transaction,

and that the guardian virtually sold the property to himself, through the medium of a third person, and so that it was contrary to the policy of the law. They ask us to find that these conveyances were collusive and fraudulent; or, if they are not fraudulent, that it be determined that Webster, and after him, his devisee has, by reason of such a conveyance, held the property in trust for the complainants.

It has been held, and is no doubt true, that when one who stands in a trust relation to property, directly or indirectly purchases it for his own benefit, equity, in the absence of laches, will afford a remedy. *Boynton* v. *Brastow*, 53 Maine, 362; *Decker* v. *Decker*, 74 Maine, 465. But in this bill there are no allegations upon which to base such relief. The allegations go only to the legality of the appointment of the guardian, and the question of fraud in the procuring the appointment, or in the subsequent conveyances. They are no broader than that, even by a liberal construction.

We think the allegations of fraud are not satisfactorily proved. And in deciding this, we do not mean, even by inference, to say that if fraud in procuring the appointment of a guardian, which was not appealed from, had been proved, it could have been relieved against in this proceeding. That question has not been argued and is not decided.

The four principal facts which the complainants claim are proved, and are the indicia of fraud, are the forgery of the petition for guardianship, the failure of Webster to account in any way for the proceeds of the sale to Ingerson, a certain false representation made by Webster to the mother of the complainants in 1876, after he was appointed guardian, but before the sale, namely, that he had paid to the decedent all of the price of the property except fifty dollars, and the further fact already stated as claimed that Webster was unlawfully but really the purchaser; and from these facts, as claimed, it is argued that the whole transaction was a fraudulent contrivance on the part of Webster to obtain title to so much of the land as he desired, without payment.

The widow of James McComiskey, and mother of the complainants, is their principal witness. Her testimony upon the forego-

ing points, summarized, is that she never signed the petition for
guardianship, nor authorized the signing, nor knew of the appoint-
ment until many years afterwards; that Webster did not pay to
her any of the proceeds of the sale for herself or the children, or,
so far as she knows, account for the proceeds; that she was in
Vinal Haven in April, 1876, which was after the appointment and
prior to the sale, and was told by Webster that he owed her fifty
dollars, and that he had paid her husband for the property all
except fifty dollars; and that he offered to give her the fifty dollars
remaining unpaid, if she would sign a paper which he had. She
did sign the paper, and it appears that it was a quitclaim deed of
the property, though she insists that she never sold her interest to
him. She testifies, also, that he never paid her the fifty dollars,
then or afterwards. It does not appear that she had any further
knowledge about the property until, at least, 1885, but it does
appear that never after April, 1876, did she make any inquiry
about the property, nor ask Webster for the payment of the fifty
dollars. Moses Webster is not living and cannot give his version
of what he said to Mrs. McComiskey. This witness also states
that she knew from her husband that he had agreed with Inger-
son, whose wife was his sister, that he, Ingerson, might have the
premises upon the payment of five hundred dollars when he was
able to pay, and that until he could afford to pay he could live
upon them free of rent. It appears that Ingerson and his wife
were living upon the premises when McComiskey died, in 1874,
and when Mrs. McComiskey visited them in 1876.

Mrs. McComiskey, the witness, had been informed, then, prior
to her visit, that her husband owned land in Vinal Haven, in which
she, by her dower right, and her children as heirs, were interested,
and that they were entitled either to five hundred dollars, in case
the arrangement with Ingerson was enforceable and was carried
out, or to the land itself. As a woman of ordinary intelligence,
she must have known so much as that. Armed with this informa-
tion as she was, it is singular indeed that she should have acqui-
esced without inquiry in a statement by Webster that he had paid
for the property all except fifty dollars. The title was a matter of

public record and easily ascertainable. The Ingersons were there, with whom the arrangement with her husband had been made, and might be able to affirm or deny Webster's statement. But it does not appear that she asked any questions of anybody. If it be true that Webster agreed to pay her fifty dollars and did not, it is singular that she never asked him for it. If it be true that she did not knowingly give Webster a deed of her interest, she must have supposed that she still owned it, and it is singular that for more than twenty years she made no effort to ascertain the situation of her estate.

Again,—and this bears also directly upon the question of fraudulent purpose,—it appears to us to be beyond question that Mr. Webster, in November, 1876, mailed to Mrs. McComiskey, at her admitted postoffice address in Nova Scotia, a bank draft, payable to her order, for one hundred and fifty dollars, and the draft was subsequently paid by the drawee in due course of business. This draft was accompanied by a letter to Mrs. McComiskey, stating that it was "in payment of balance due you for land sold as guardian for your children." Mrs. McComiskey denies the receipt of either the draft or the letter. The draft itself has become lost or destroyed, and it cannot be made certain that she did or did not indorse it.

Now it is not claimed that the payment of the money to the mother would be a good payment to the children, nor that they would thereby be barred necessarily of a recovery from their guardian, by the proper form of action. But if Moses Webster did mail a draft for the one hundred and fifty dollars to the mother and natural guardian of the children, and did then by letter intended for her perusal state that the draft was for a *balance* due her for lands sold *as guardian* for her children, and the letter and check were sent in the usual course of business, we think it is entitled to much weight, especially after the lapse of so many years, as showing an absence of fraudulent purpose on his part. And in this respect, it makes no difference whether Mrs. McComiskey received the draft and letter or not. But the probabilities of her having received them, do, in view of her testimony, bear upon her credibility.

If Mrs. McComiskey knew of the arrangement between her husband and Ingerson, whereby the latter expected to have the property on payment of five hundred dollars, as she says she did, and if she knew in 1876, as the evidence leads us to believe that she did, that the money had not then been paid, and that either the land or the five hundred dollars belonged to her and her children, (for in addition to considerations already noticed, she testifies that Ingerson told her then, in 1876, that "he wished he could sell it [the land] and give me the money") and if, as she testifies, she knew in 1885, that the Ingersons had never paid anything on the place, why did she not make some inquiry about it? Her children were living at home with her, and naturally she was interested for them as well as for herself. That she did not bestir herself seems almost incredible, upon these assumptions. Her conduct seems to be consistent only with the theory that she had been content to have her husband's arrangements carried out, and that the five hundred dollars had been paid by Webster to her, which accords with the statement of Mr. Webster in his letter to her.

The only other testimony which throws light upon the transaction is that of Mrs. Ingerson, the sister of McComiskey, and widow of John S. Ingerson. Her statements tend to show that Mr. Webster desired a part of the land, and for that part was willing to pay the whole five hundred dollars, and that it was arranged between Webster and Ingerson that the former should pay the widow and children of McComiskey the five hundred dollars, for the part he desired, and that Ingerson should have the remainder of the land, which would be in effect carrying out the arrangement with McComiskey. If this was so, it falls far short of proving fraud, whatever else may have been the nature of the transaction.

There seems to be a probability against the fraud theory. Mr. Webster was dealing with real estate which was known by McComiskey's wife to belong to his heirs. Webster must act under the publicity of proceedings in court. The records of that court and the records of the various transfers of title are public and subject to inspection. He gave a bond, and could be held responsible for his acts. He could hardly expect that a fraud would remain undetected, under the circumstances.

Twenty-three years have elapsed since the transactions complained of. Webster died ten years before this bill was brought. Ingerson is dead. Some of the attesting witnesses to the deeds, who might have knowledge, are dead. The bank draft which, as we have seen, would be important to corroborate or impeach the testimony of Mrs. McComiskey, is lost.

Fraud is never ·to be presumed, but must always be proved. *Grant* v. *Ward*, 64 Maine, 239. And we think in a case where a long time has elapsed, and parties and witnesses are dead, and important papers are lost, the proof of fraud should be clear, full and convincing. Such proof the complainants have failed to furnish.

We think, too, that the complainants may fairly be barred by laches. If we assume that the testimony offered by them is to be fully credited, and that the transactions were fraudulent, and no payment had been made by Webster to any one for them, we think the statements which Mrs. McComiskey says she made to them as far back as 1885, were sufficient reasonably to put them upon inquiry. Webster was alive then, and could have answered them in or out of court. Two of the complainants were of age, one was twenty years old, and one sixteen. The younger ones were not old enough to act for themselves, but they were old enough to listen, to understand and to remember. They were old enough to appreciate that they had, or might have, property interests at stake, if the statements made to them were true. But they waited before they brought their bill eleven years after the next to the youngest, and seven years after the youngest, became of full age. Parties should not sleep upon their rights, while others interested are dying and evidence of the facts is fading out. *Spaulding* v. *Farwell*, 70 Maine, 17; *Godden* v. *Kimmell*, 99 U. S. 201; 2 Pomeroy Eq. Jur. §§ 917, 965.

The point of illegality in the appointment of guardian, aside from the alleged fraud, we think it is not necessary to discuss at length. So far as the validity of the defendants' title may be affected by a question ·of that kind, the issue must be tried in an action at law, where the remedy is full and complete. It is not the

business of equity to try titles, and put one party out and another in. *Robinson* v. *Robinson*, 73 Maine, 170. The complainants are not in possession, and they cannot by bill in equity test defects or flaws in defendants' title. *Gamage* v. *Harris*, 79 Maine, 531.

*Bill dismissed, with costs.*