## HARPER v. SANDERSON.

### In re SANDERSON.

(District Court. D. New Jersey. March 9, 1920.)

1. **Bankruptcy ⊚⟹303(3)—Evidence sufficient to show representation by bankrupt that he owned property subsequently conveyed to wife.**

   In a suit to set aside a conveyance of property by a bankrupt to his wife more than two years before bankruptcy, evidence *held* to show that, in contracting a debt prior to such conveyance, he represented that he owned the property.

2. **Bankruptcy ⊚⟹303(3)—Evidence sufficient to show wife's ownership of property and disprove fraud in transfer.**

   In a suit to set aside a conveyance of property by a bankrupt to his wife more than two years before bankruptcy, but at a time when he was in debt, evidence *held* to show that a lot was purchased and a house built thereon with money given to the wife by relatives, and that the transfer was not for the purpose of hindering, delaying, or defrauding creditors.

3. **Bankruptcy ⊚⟹303(3)—Inference that nonpublication of deed was to conceal it from creditors unwarranted.**

   In a suit to set aside a conveyance from a bankrupt to his wife, where the lawyer drawing the deed testified that he indorsed it "Do not publish," to keep it out of the newspapers, and there was no evidence to the contrary, it could not be inferred that the sole object of so indorsing it was to prevent creditors from obtaining information.

In Equity. Suit by David Harper, trustee in bankruptcy of William C. Sanderson, bankrupt, against Agnes L. Sanderson. Bill dismissed.

Lintott, Kahrs & Young, of Newark, N. J., for complainant.

James R. Nugent, of Newark, N. J., for respondent.

LYNCH, District Judge. The complainant seeks to cancel and set aside a certain conveyance of real property made by the bankrupt to his wife, the respondent, on the ground that it was made while the bankrupt was insolvent, for the purpose of defrauding and cheating his creditors, and to compel a conveyance of said property to the com-

plainant, as trustee. The conveyance was effected July 1, 1915, while the voluntary petition in bankruptcy was filed July 17, 1917.

The bankruptcy records show that after this action was begun, and while it was pending, this particular chose in action was sold to Michael Winter, the largest creditor of the bankrupt estate, for the sum of $35; the said Winter releasing the complainant, as trustee, from all claims to any dividends which he might become entitled to from the bankrupt estate on his claim of $6,494.58 filed therein. The complainant testified that he is no longer interested in this suit.

[1] Michael Winter, who conducted a brewery at Orange, N. J., loaned $7,000 to the bankrupt under an agreement dated January 21, 1913; $1,500 of this loan was repaid, leaving a balance of $5,500 due at the time of the adjudication.

Frank W. Winter, son of Michael Winter, testified that he advanced the $7,000 as a loan to the bankrupt, without security, after endeavoring to obtain from Sanderson a mortgage on the property known as 176 Kilburn Place, South Orange, which Sanderson said he owned; that Sanderson told him that he did not want it known that he was borrowing money to start in business, which the execution of a mortgage might reveal.

William F. Worster, associated with Michael Winter, testified that during 1912 he visited Sanderson at his home seven or eight times for the purpose of negotiating this loan, the moneys to be advanced for the purpose of enabling Sanderson to open a café in the Kinney Building, Newark, under an agreement providing for the sale by Sanderson of Winter's beer only; that during the negotiations Worster asked for either notes or mortgages as security for the amount of the loan; that Sanderson refused to agree to give a mortgage on his property, which he stated he owned, claiming that he was an honorable man, owned property, kept his word, and he did not want it to be known that he was borrowing.

Floyd S. Teets, manager of bank accounts of the Merchants' Bank, of Newark, testified that on July 1, 1915, the bankrupt owed that bank $2,500, which was reduced to $2,300 on July 6, 1915, at which latter sum the debt remained for the remainder of that month.

Joseph Kahrs, one of the attorneys for the complainant, testified that during the negotiations for the loan late in 1912 he was consulted, as attorney for the Orange Brewery; that Sanderson visited his office, where he conversed with him regarding the giving of security; that Sanderson stated to him that he owned the house and lot in South Orange, but he refused to agree to mortgage it, or to give a chattel mortgage covering the fixtures and personal property of the café to be established; that the representation of Sanderson that he owned the real property in South Orange, which he would not agree to mortgage, was one of the ingredients which influenced the brewery people in making the loan without security.

[2] I have no doubt whatever that Sanderson, the bankrupt, did represent to the brewery representatives and to Kahrs that he owned this South Orange property; and I am also inclined to believe that this representation may have in some degree influenced the brewery

people in advancing to him $7,000 without chattel mortgage, real estate mortgage, notes, or other security. But the immediate question is: Did Sanderson actually own the property standing in his name which, it is claimed, he pretended to own?

There is no testimony in the case to the effect that Mrs. Sanderson, the wife, ever stated to anybody that her husband owned this property, or that she did not own it. What were the actual facts? What was the actual situation? The respondent insists that this property, conveyed to her by her husband on July 1, 1915, is now, and ever since it was acquired in 1910 and 1911, has been her own individual property; that the conveyance to her, now attacked, was for the purpose of placing the title in her name, where it belonged, and where it should have been placed long before.

George C. Sanderson, father of the bankrupt, in answer to interrogatories taken in Florida, where he is engaged in the orange and grape fruit business, testified that it was his habit to visit his son and daughter-in-law every year during the summer, and often in November; that he visited them shortly after their marriage, at which time a home was discussed; that on a visit in 1902 he did not find their home particularly pleasing, so he advised Mrs. Sanderson to buy a lot in her name and build a home on it, telling her that he would do everything in his power to assist them, as he expected at some time to make it his home; that from that day on he gave Mrs. Sanderson money yearly for that purpose, and continued to do so until the house was completed, his payments averaging $500 or $600 per year; that the lot was purchased in 1910, and the house constructed in 1911; that he never kept any memorandum of the amounts given respondent, but the amounts ranged from $100 upwards, and totaled between $2,500 and $3,000; that he always carried large sums of money with him, largely $50 and $100 bills, and when he visited her he handed her cash, and when away sent her drafts; that some time after the house was completed he learned that the title was in the name of the bankrupt, when he advised both Mr. and Mrs. Sanderson that the title should be in the wife's name; that he has continued to give money to Mrs. Sanderson since the house was finished, contributing between $3,500 and $4,000 altogether.

William C. Sanderson, the bankrupt, testified regarding the negotiations for the $7,000 loan with which he established the café in the Kinney Building. He admits refusing to give a chattel or real estate mortgage. Before going into this café business he was a salesman, supporting his home; that his father advised his wife to build a home, and gave her money toward the purchase of a lot; that his wife at different times handed him this money to put in his bank account, which he did; that they looked around, and after selecting a lot he drew his check against her funds in his account and paid for it; that his wife had no bank account; that his father handed his wife cash on visits, and he saw drafts received by her from him; that the moneys which he used in the purchase of this lot and the building of the house thereon were the moneys which were turned over to him for that purpose by his wife, who had received them from his fa-

ther and her brother; that he opened his café in June, 1913, and closed it in July, 1917; that business was not good from the very start; that he paid the taxes on the property and the interest on the $6,500 mortgage; that he knew that the title to this property belonged in his wife's name, and he made five or six appointments with Paul G. Roder, an attorney at law, covering a period of 2½ years prior to July, 1915, for the purpose of transferring it to her, but he neglected to keep these appointments.

Paul G. Roder, counselor at law, of Newark, testified that he had many talks with Mr. and Mrs. Sanderson regarding the transfer of the title of this South Orange property to the wife; that these consultations began in 1911, while the house was being constructed; that he requested Sanderson to bring to him the "papers," so that he might prepare the deeds, but Sanderson neglected to keep his promise to do so; that "Mr. Sanderson asked me to come to see him in reference to his contemplated enterprise, the conduct of the Savarin Café, and I called on him on Sunday afternoon. and my recollection is that it was in the fall of 1912, and * * * while I was there Mrs. Sanderson came in the house, and she said, 'Will, Mr. Roder is here; give him the papers, so that he can fix this up;' and he said, 'I will see that he gets them the next few days,' or something to that effect, but I didn't get them;" that there were several conversations after that regarding the matter before the papers were finally brought to him and the deeds prepared and the transaction consummated in July, 1915.

Agnes L. Sanderson, the respondent, testified that after her marriage her husband's father advised her to buy a home, and offered to assist her in procuring one; that he gave her $200, and during the first three years a total of $600; that he gave her cash when he visited her, and forwarded to her drafts when away, and altogether gave her from $2,800 to $3,000, all of which was used in the purchase of a lot and the erection of a home thereon; that this money was deposited in her husband's bank account at her request, as she had no account, and, not being familiar with business transactions, desired her husband to attend to the details; that she also received the sum of $2,400 as a gift from her brother, all of which also was used in the acquirement of the new home; that the value of the property is about $11,900, made up approximately as follows: Mortgage, $6,500; received from father-in-law, $3,000; and received from brother, $2,400; that while the house was being built, and many times subsequent thereto, she consulted with Lawyer Roder regarding the placing of the title in her name, which was finally done.

Harry E. Morgan, brother of the respondent, testified that after his father's death the respondent proposed that he and their mother break up the old home and take up their residence with the respondent, who was about to build a new home; that—

"At first I didn't like the idea. It seemed as if the old place was kind of dear, and everything else, but we talked it over different times. I thought it would be all right. We talked about building the home, and everything else, and she says, 'You know this will be always your home and your mother's home; if it ain't yours it will be your mother's home; your mother and my

mother,' she said, 'will be taken care of.' So I said, 'Well;' after a little while —you don't do things in the first talk over; we talked it over at different times; finally I decided, 'All right, we will make our home with you.' And I went over to the bank and drew the money out of the Security and out of the Howard Bank, and I had given this money to my sister—no security, no note, no mortgage, or nothing. I had given it to her for to make my home there with my mother, and for my mother and myself.

"Q. Why didn't you carry that out? A. Well, after a little while, some time after that, my brother was taken sick; he had hardening of the arteries and a bleeders disease, if you know what that is—

"Mr. Kahrs: We are getting pretty far afield.

"A. Then he had rheumatism.

"Q. Well, due to the illness of your brother— A. He was crippled, so that he wasn't able to work, and he hasn't been able to do a day's work since, and I still make my home with my brother and sister-in-law, and my mother is with them, too, and we did not go up to my sister's, although I still have that opportunity to go to my sister's house any time I want to."

Morgan's bank deposit book No. 138379 of the Howard Savings Institution, Newark, showing a withdrawal of $1,450 on June 20, 1911, and deposit book No. 33342 of the Security Savings Bank, Newark, showing a withdrawal of $950 on June 20, 1911, were offered in evidence.

[3] The complainant argues that when Counselor Roder indorsed the words "Do not publish" on the deed, before it was sent to the register's office for recording, "the sole object to be achieved by not publishing this conveyance was to prevent the creditors of the bankrupt from having information regarding the same." Roder's testimony with respect to this is as follows:

"Q. Now, what was the object of putting 'Do not publish' on those deeds? A. Why, most of my deeds, before it became compulsory, I always made it a request, 'Do not publish' deeds, and 'Do not publish' mortgages.

"Q. Now, the effect of that was to keep it out of the newspapers? A. Out of the newspapers, yes. It was a general practice in my office.

"Q. That is why you wrote 'Do not publish' on these deeds, so that the record would not be published? A. Yes, published in the newspapers."

So the only testimony in the case on that point is that the indorsement was not made for the purpose of preventing creditors from coming into possession of information regarding the transfer, but was made by the attorney in pursuance of a general practice in his office. It is a well-known fact that the recording of transfers and incumbrances is constantly being kept from the newspaper accounts by attorneys and others who desire to avoid publicity for one reason or another. In view of Roder's testimony, I cannot infer that the sole object was to prevent creditors from gaining information.

The evidence on the part of the respondent, which is practically uncontradicted, establishes that the respondent was the actual purchaser of the lot and the builder of the house thereon; that it was her property, because her moneys—moneys given to her—created it; that the title was properly placed in her name in July, 1915; and that this transfer, made over two years before the beginning of the bankruptcy proceedings, was not made for the purpose of hindering, delaying, or defrauding creditors.

Accordingly the bill should be dismissed.