## SMALL v. GILBERT et al.
### No. 4051.

District Court, D. Maine, N. D.
March 3, 1932.

Clarence H. Crosby, of Dexter, Me., for plaintiff.

L. B. Waldron, of Dexter, Me., for defendants.

HALE, District Judge.

The plaintiff, trustee of John Baskett, bankrupt, brings this bill in equity under the provisions of section 70e of the Bankruptcy Act (11 USCA § 110 (e).

The bill seeks to set aside a certain mortgage for $2,000 dated February 26, 1930, given by John Baskett upon his homestead in Dexter to Louis Gilbert, with the alleged intent to defraud the creditors of Baskett, and in contemplation of bankruptcy. The bill alleges that Gilbert paid no consideration for the mortgage, and that he received it with the knowledge that a certain creditor of the bankrupt would be thereby defrauded. It seeks also to set aside the assignment of this mortgage from Gilbert to Mary Baskett as fraudulent, without valuable consideration, in bad faith, and for the purpose of hindering, delaying, and defrauding creditors of the bankrupt.

The answer admits that John Baskett executed the mortgage and the note in question, and alleges that he was anxious to raise funds for his son, Thomas J. Baskett, with which to pay labor and other claims; and that he sought a loan from his wife, Mary Baskett, for that purpose; that she had been led to believe that a contract between husband and wife could not be enforced, and so she made the loan to John Baskett for $2,000, but had the papers executed through a third person, Louis Gilbert, the codefendant; that she furnished the full sum of $2,000 from her own money for the mortgage and loan thereby secured. She denies that she had any purpose or intention to defraud any creditor, and says that she had no knowledge of any indebtedness of John Baskett to the Merrill Trust Company, or that John Baskett had signed any notes or obligation on which he was, or might be, liable to the Merrill Trust Company; and she denies that she received the note and mortgage with the knowledge that the Merrill Trust Company was a creditor of John Baskett.

With reference to the assignment of the mortgage, she says that Louis Gilbert assigned the mortgage to her on March 6, 1930, together with the note secured by it, and that the mortgage and note were in fact her property and held in trust for her by Louis Gilbert, for which she paid the full consideration of $2,000. She says that the mortgage and note, and the assignment, were made in good faith; and that she took them in good faith, without any fraudulent intent.

Louis Gilbert in his answer denies that he received the mortgage with knowledge and understanding that the Merrill Trust Company was thereby to be defrauded, and says that he knew nothing about the indebtedness of John Baskett to the Merrill Trust Company, and never heard of such indebtedness until a long time thereafter.

He admits that on March 6, 1930, he assigned the mortgage to Mary Baskett, together with the note secured by it; but he denies that Mary Baskett paid no consideration for it. He says that she paid the consideration of $2,000, and was therefore in equity entitled to the assignment; and he denies that there was any purpose to defraud. He avers that, so far as he is concerned, the whole transaction was honest and above board, and that he believes the same to be true on the part of Mary Baskett.

These answers were, at the request of the plaintiff, made under oath.

The law making fraudulent conveyances void is founded on the Statutes of Elizabeth, now the common law of Maine. Butler v. Moore, 73 Me. 155, 40 Am. Rep. 348; Jones v. Light, 86 Me. 437, 30 A. 71. Whether a particular transfer attacked by bill in equity under section 70e of the Bankruptcy Act is or not fraudulent as to creditors depends, not on the Bankruptcy Act, but upon the laws of the state where the transfers are made. Woodman v. Butterfield, 116 Me. 241, 101 A. 25.

In a suit brought by a trustee in bankruptcy to set aside a conveyance alleged to be in fraud of creditors, the bankrupt is not a necessary party; it is assumed that he had no interest to be affected except that which was represented by his assignee in bankruptcy who brings the suit. Huntington v. Saunders, 120 U. S. 78, 7 S. Ct. 356, 30 L. Ed. 580; Buffington v. Harvey, 95 U. S. 99, 24 L. Ed. 381.

The Revised Statutes of Maine, chapter 90, § 14, provides for proceedings on levy made on land fraudulently conveyed by debtor or of which he has been deseized and in-

to which he had a right of entry; but it appears that the remedy afforded by this provision is not exclusive. The Revised Statutes of Maine, chapter 91, § 36, par. 11, provides that the courts of Maine have jurisdiction as courts of equity in "bills in equity, by creditors, to reach and apply in payment of a debt, any property, right, title, or interest, legal or equitable, of a debtor, or debtors, which cannot be come at to be attached on writ, or taken on execution in suit of law, and any property or interest conveyed in fraud of creditors."

It appears that one may proceed either at law or in equity. Brown v. J. Wayland Kimball Co., 84 Me. 492, 24 A. 1007.

By the Bankruptcy Act, § 47a (2), 11 USCA § 75 (a) (2), the trustee, as to all property not in the custody of the bankruptcy court, shall be deemed vested with all the rights, remedies, and powers of a judgment creditor holding an execution duly returned unsatisfied. It seems that, even apart from the provisions of the Revised Statutes (Me.) chapter 91, § 36, the trustee has no adequate remedy at law.

It may be said further, I think, that the defendants have filed their answer to the bill in equity and have entered their defense upon the merits of the case; and hence they must be held, in any event, to have consented to the jurisdiction of equity, and to have waived their right to a trial at law, if they had any such right.

While a jury trial is sometimes ordered by a court in equity to "enlighten the conscience of the court," the granting of a jury trial rests in the discretion of the chancellor, and is not the subject of exception. Barton v. Barbour, 104 U. S. 126, 26 L. Ed. 672; Shields v. Thomas, 18 How. 253, 15 L. Ed. 368.

In the instant case, the defendant moved for a jury trial, but it was denied by Judge Peters. If the jury trial had been ordered, the chancellor could have given such weight to the verdict of the jury as he thought to be required by equity. The action taken by Judge Peters was in accordance with equitable principles and rules.

From the proofs it appears that from June 17, 1926, to March 20, 1928, John Baskett indorsed for the accommodation of Thomas J. Baskett, his son who was also in bankruptcy, eleven promissory notes of the total of $13,101.02 payable to the order of the Merrill Trust Company. On February 26, 1930, John Baskett executed a mortgage and note covering his homestead place in

Dexter to Louis Gilbert, a relative, for the sum of $2,000. This mortgage was recorded in Penobscot Registry of Deeds on February 26, 1930, volume 1040, page 409. On March 7, 1930, an alleged assignment of this mortgage from Louis Gilbert to Mary Baskett was recorded in the same Registry of Deeds, volume 1040, page 436; the date of the alleged assignment was March 6, 1930. The mortgage is referred to as "unrecorded at this date."

On May 20, 1931, John Baskett filed his voluntary petition in bankruptcy. On May 22, 1931, he was adjudicated a bankrupt. The schedules of the bankrupt listed no assets apart from his homestead place, the value of which was stated as $2,000, and which was alleged to be mortgaged to Mary Baskett for the sum of $2,000.

In this proceeding both the mortgage and the assignment are attacked as fraudulent conveyances, executed when the bankrupt was insolvent, without a valuable consideration, in bad faith, and for the purpose of hindering, delaying, and defrauding creditors of the bankrupt.

The burden is upon the plaintiff of proving that the conveyance in question was fraudulent. Fraud cannot be presumed. It must be proved; and it is held that the proof must be clear, full, and convincing. Frost v. Walls, 93 Me. 405, 45 A. 287; Grant v. Ward, 64 Me. 239. But it does not follow that fraud cannot be deduced from acts and circumstances. Evidence arising from circumstances may of itself be sufficient to outweigh the force of an answer under oath. Adams v. Johnson, 107 U. S. 251, 2 S. Ct. 246, 27 L. Ed. 386; Clark v. Van Riemsdyk, 9 Cranch, 153, 3 L. Ed. 688.

It is not in the nature of fraud, that it should be made openly. Where all circumstances point in one direction, the proof of those circumstances is often compelling. Ingersoll v. Barker, 21 Me. 474.

Proofs of fraud are not restricted, of course, to direct and positive evidence. It is sufficient to prove, by a preponderance of evidence, facts and circumstances from which a fraudulent intent may be inferred. Where fraud must be shown largely by circumstantial evidence, such evidence must be considered in its entirety without giving undue importance to isolated facts. Harper v. Sanderson (D. C., N. J.) 264 F. 857; Davis v. Gates (D. C., Pa.) 235 F. 192.

By the answer and proofs, it is shown that, when John Baskett gave the mortgage, he was insolvent. He was liable as an in-

dorser of notes to the Merrill Trust Company for over $13,000.

It appears from the testimony of both defendants that, on February 26, 1930, they went to Bangor to the office of a lawyer, Mr. Percy A. Smith, and executed the mortgage in question. The certificate of the register of deeds shows that this mortgage was presented for record at 10:53 a. m. on February 26, 1930, and was not delivered to Gilbert until March 10, 1930. Each defendant stated in the answer, and Gilbert in his testimony, that the assignment was not drawn up until March 6.

The assignment refers to the mortgage as "unrecorded at this date." On the front there is some indication of the erasure of the word "February" which was not altogether obliterated.

The proofs leave no doubt in my mind that both the mortgage and the assignment were drawn up on the same day, February 26, 1930. The assignment appears to have been dated March 6 from some idea in the minds of the defendants that the assignment should be later than the mortgage itself.

Both defendants testified that they went back to Dexter on February 26, taking the mortgage with them. This, of course, was impossible, as the mortgage must have been at that time in the office of the register of deeds.

Mary Baskett in her answer stated that the purpose of the loan was for her son, Thomas. She testified at first that she did not know what her husband was going to do with the money.

She testified that, in the winter of 1930, John Baskett applied to her for some money to help his son pay his bills, and that at the time she took the mortgage from her husband in the house at Dexter, through Mr. Gilbert, she let John have $2,000; that it was her own money; that she had earned it in past years in the mill, in the shop, corn shop; that she was afraid of the bank "on account of the failures" and because in the Waterville Trust Company she had come "pretty near losing it." She said: "I gave it to Louis Gilbert when he got back with the mortgage." "He gave it to John, my husband." "I went into the room and gave the money to Louis, then Louis took and gave the money to John." "I was in the room with them." She was asked: "Are you being helped by the Town now Mrs. Baskett? A. Yes, now. They give us $4.00 a week." In cross-examination she testified:

"Q. Do you know that in your answer in this case you state that the purpose of the loan to your husband was to loan it to Tom Baskett? A. I thought it was for that. He never said it in front of me.

"Q. Why didn't you loan it direct to Tom Baskett then?"

After interruptions by counsel, she answered:

"A. He didn't want to give me no security. And I wanted security.

"Q. Did you know that Tom Baskett had a garage? A. Yes.

"Q. Do you know that he owned the land that the garage was on? A. I had it told to me. I didn't serve as witness or anything.

"Q. Did you know that Tom Baskett had a large stock in trade up there in that garage? A. Yes. I saw it when I would go up there. I would see it in there."

She further testified that she knew Tom Baskett "owned a garage with a stock in trade in it, a going concern, and also a cottage and land on the shore of a lake," and she had heard that he owned a house on Spring street in Dexter. She was asked:

"Q. Well, why, with all that property that Tom Baskett had, couldn't he give you good security? Knowing that Tom Baskett owned a garage with a stock in trade in it, a going concern, and also a cottage and land on the shore of a lake, why couldn't Tom Baskett give you good security for a loan? For a direct loan?"

After objections by counsel, she answered:

"It wasn't the boy who was asking the money. It was my husband.

"Q. Did your husband tell you that is what he wanted it for? A. He never told me, but I thought it was to help my boy."

She was asked:

"Q. How was Louis Gilbert brought into it? A. It was my husband that asked Louis.

"Q. My question was, how did you happen to bring Louis Gilbert into it? A. John went and got Louis.

"Q. Who did? A. My husband. John. Went and got Louis Gilbert to take the mortgage, so I could have my security.

"Q. Did you ask your husband to do that? A. Yes. To get my security.

"Q. But you knew that Tom Baskett had plenty of security for a direct loan?"

After objections, she answered:

"A. I don't know whether he owned it all; I know I done my business at home, and they done theirs."

She was afterwards asked:

"Q. Don't it strike you as sort of queer that you and your husband couldn't make an arrangement between yourselves? Didn't it? A. No. The people told me we couldn't make a legal transaction between man and wife."

I saw the parties upon the stand, and examined them with great care. The defendant Gilbert did not seem to me to be open and frank. His testimony indicated a desire to make his answers according to some method which had been marked out for him. The son, Thomas Baskett, admitted that at the time the mortgage was given he had $2,800 worth of securities, and afterwards gave mortgages for that amount to other parties, and, when he was asked why he did not borrow directly from his mother, he said: "I cannot answer that question * * * I don't know." He refused to answer the question whether or not the purpose of the transaction was "to take care of the old folks," whether it was right or wrong, and said that from his standpoint it was right.

Mary Baskett testified at first that she took "over $2,000" with her to Bangor to Smith's office. She then said that she had left it home in a drawer; that she had had this large sum of money in her drawer for years. When asked if she had thought of the danger of leaving it in the house in case the house caught fire, she said, "After that I didn't leave it." But, if her testimony is truthful, the money had already left her hands.

Her testimony is that she had earned this large sum in previous years, and had kept it in her house in a bureau drawer, having no confidence in banks. She is not corroborated by any disinterested party to show the existence of any money in her house; and, although she says she did not dare to trust banks, the deposit cards show that she and her husband had some faith in banks as late as 1929; and the bank cards show gradual withdrawals of money from the bank apparently for living expenses.

I examined her carefully while she was upon the stand. Her story was so inherently improbable, and was so contradicted by the facts in the case, that I could not think it worthy of belief, although from her appearance I do not think she realized the full effect of her testimony.

In Quock Ting v. U. S., 140 U. S. 417, 11 S. Ct. 733, 734, 35 L. Ed. 501, Mr. Justice Field said: "Undoubtedly, as a general rule, positive testimony as to a particular fact, uncontradicted by any one, should control the decision of the court; but that rule admits of many exceptions. There may be such an inherent improbability in the statements of a witness as to induce the court or jury to disregard his evidence, even in the absence of any direct conflicting testimony. He may be contradicted by the facts he states as completely as by direct adverse testimony; and there may be so many omissions in his account of particular transactions, or of his own conduct, as to discredit his whole story. His manner, too, of testifying may give rise to doubts of his sincerity, and create the impression that he is giving a wrong coloring to material facts. All these things may properly be considered in determining the weight which should be given to his statements, although there be no adverse verbal testimony adduced."

In Maxwell v. Adams, 130 Me. 233, 154 A. 904, 906 (1931), after referring to the fact that proof of fraud should be "clear, full, and convincing," Mr. Justice Thaxter said: "This maxim does not, however, mean that in an action based on fraud we cannot as in other instances draw inferences from known or admitted facts. State v. Kimball, 50 Me. 409, 420. If it were not so, it would seldom be possible to establish fraud at all, for the proof of it ordinarily lies in circumstantial evidence. The intent with which an act is done is ordinarily the material factor. That is not customarily evidenced, certainly where the purpose is fraudulent or unlawful, by an open avowal of it; but can only be deducted from acts and circumstances. When not one but several of these all point in one direction, their force is often compelling. Ingersoll v. Barker, 21 Me. 474. * * *

"In Twynes Case, 3 Coke, 80b, decided two hundred and fifty years ago, we find the following language: 'And therefore Reader, when any gift shall be made to you in satisfaction of a debt by one who is indebted to others also; 1. Let it be made in publick manner, and before the neighbors, and not in private, for secrecy is a mark of fraud.' * * *

"Transactions which are legitimate are not ordinarily conducted out of the usual routine of business. When a circuitous course is followed to do that which customarily would be done openly as an ordinary business affair, we are justified in asking for

an explanation. The Maine Insolvent Law was but declaring a common-law doctrine when it provided that a transfer made out of the usual course of business was prima facie fraudulent (Rev. St. 1903, c. 72, § 55). Mathews v. Riggs, 80 Me. 107, 13 A. 48. * * *

"In Phinney v. Holt, 50 Me. 570, 575, Judge Walton uses the following language: 'When it can be shown that a party has disposed of all his attachable property, some progress has been made in establishing such a fraud. If in addition to this it can be shown that it has been disposed of to a relative, the evidence is strengthened, for experience shows that such transfers are oftener made to relatives than strangers.' * * *

"When a plaintiff, who is seeking to set aside a transfer as fraudulent, proves that it was made by a debtor on the eve of bankruptcy, that it involved a payment of money to a near relative, that it was made secretly or in an underhanded way, he has made out a prima facie case. He does not have to go farther and prove that no consideration in fact passed. Under such circumstances, the burden of establishing good faith, of overcoming the presumption of such evidence, is on a defendant who was a participant in the affair.

"In the case of Page v. Smith, 25 Me. 256, the defendant was charged as trustee under a provision of the statute which provided that, 'if any person, summoned as trustee, shall have in his possession any goods, effects or credits of the principal defendant, which he holds under a conveyance that is fraudulent and void, as to the creditors of the defendant, he may be adjudged a trustee on account of such goods, effects or credits.' The evidence showed a conveyance by a man in embarrassed circumstances to his brother, the defendant, who claimed that the conveyance was for a valuable consideration. The court held that it was the defendant's duty to have put his brother on the stand to explain the transaction, and that, having failed to do so, he did not overcome the prima facie case made out by the plaintiff. The court said (page 266 of 25 Me.): 'These circumstances present a case so unlike anything that would ordinarily occur in a bona fide transaction, that, to say the least of it, should excite strong suspicions of fraud. And when such is the case, if the party implicated be in fact innocent, and has the means of making his innocence appear quite within his power, and does not do it, it is but reasonable, that the conclusion should be against him.' "

In State v. Stain, 82 Me. 472, 478, 20 A. 72, the court said: "Affirmations and denials by word of mouth may be fabricated; but circumstances and the happening of facts cannot. The latter is the crucible wherein to test the truth or falsity of the former." The court quotes Chief Justice Peters: "Truth weaves without effort a finer web than falsehood can with all its art and cunning."

In the case at bar, many conspicuous signs of fraud appear. The bankrupt was insolvent; at the time of the transfers, Mary Baskett was not scheduled as a secured creditor. Thomas Baskett was not scheduled as a debtor owing the bankrupt $2,000. All the attachable property of the bankrupt was embraced in the mortgage. All the transactions of the parties were secret and circuitous, and not straightforward and open. The obvious method of making a transfer would have been to take the money to the lawyer in Bangor and have the passage of the papers accompanied by the passage of the money. I am satisfied from all the evidence that no money passed; and hence the conveyance was a gift made by an insolvent debtor; the effect of the gift was to leave the debtor insolvent. The legal intent must be inferred to hinder, delay, and defraud creditors.

I think the plaintiff has met the burden of showing by a preponderance of competent evidence that the transfer in question was fraudulent and void. A decree may be presented, setting aside the mortgage and the assignment as fraudulent and void. The plaintiff recovers costs.