NISBET, Assignee, etc., v. QUINN.

THE SAME v. DUB.

THE SAME v. KAHN.

(*Circuit Court, S. D. Georgia, W. D.* May 12, 1881.)

1. FRAUDULENT SALES—REV. ST. §§ 5129, 5130.

Sales amounting to $1,100, $1,900, and $2,200, made in one week to three persons by a retail dealer who owed $11,000, and whose stock consisted of merchandise worth $8,000, and whose sales, in the usual course of his business, amounted to $1,100 per month, are *prima facie* fraudulent, under sections 5129, 5130, of the Revised Statutes.

2. SAME—VENDEES.

Where the vendees were familiar with the nature of the bankrupt's business, and where such purchases were not in the ordinary course of the business of the vendees, as well as in that of the vendor, the assignee in bankruptcy of the latter may recover from them the value

of the goods, unless they can show that at the time of the transactions they made inquiry and satisfied themselves that the vendor was selling for a legal purpose.

3. SAME—SAME.

In such a case, the mere statements of the vendees that they did not know that the vendor intended any fraud on the bankrupt act amount to nothing. The law declares that they did know; that the fact of the vendor making the sales out of the usual course of his business conveyed knowledge to them *prima facie* of an illegal purpose; and it is for them to show that by inquiry and investigation they became reasonably satisfied that the sales were properly and legally made.

Mr. Justice WILLIAM B. WOODS delivered the following decision :*

These three cases were heard together, the facts being substantially the same in each. They are bills in equity filed by Robert A. Nisbet, assignee of A. Dans, a bankrupt, to recover from the defendants the value of certain goods alleged to have been transferred to them by Dans when insolvent, and with intention to defeat the operation of the bankrupt act, and not in the usual course of his business.

The case against Thomas Quinn will be taken up first. The facts are these: Dans began business in March, 1877, at Huff's corner, in the city of Macon, Georgia. His business was that of a retail dealer in cigars, tobacco, pipes, etc. His capital at that time does not appear in the evidence. His ordinary monthly sales from the beginning of his business up to December following, the time of his adjudication in bankruptcy, were $1,000 per month. In November he had $8,000 worth of stock in his store. The debts proved against him in bankruptcy show that he was indebted to parties from whom he purchased his stock something over $7,500. During the month of November, and during one week of that month, from the 22d to the 29th, Dans made sales of his stock to an amount of a little over $5,000 to three persons. To Quinn he sold goods worth $1,100, to Kahn over $1,900, to Dub $2,200. During the

*Reported for the FEDERAL REPORTER, from the opinion and summary of facts pronounced orally by Judge Woods, by W. B. Hill, Esq., of the Macon bar.

same month, he testifies that his sales to other parties in the ordinary retail trade amounted to $1,500.

At the time of these transactions with Quinn, Kahn, and Dub, and before any of the creditors had begun proceedings by attachment in the state courts against him, Dans employed Mr. W. Desson, an attorney of Macon, to write to his creditors that on account of losses in business he could not meet his obligations, and to submit a proposition of compromise. In addition to the proven debts, he owed debts for borrowed money; for, according to his testimony, he paid $3,300 to such debts with the proceeds of the sales to Quinn, Kahn, and Dub. So it appears that his total indebtedness was about $11,000, and his property consisted wholly of his stock, worth $8,000, and some accounts which he testifies were small in amount and value: Hence, it is perfectly clear that Dans was at that time insolvent. His own confession is in the record that he had employed an attorney to write to his creditors and inform them that he was unable to pay his debts. Dans had been and was a retail dealer in the articles composing his stock. He now suddenly becomes a wholesale dealer. At no time prior to these transactions had his sales averaged more than $1,100 per month; at no time had any single sale amounted to more than $100; but his sales in the usual course of his business were small retail sales.

The law declares what the fact that a sale is made out of the ordinary course of business of the debtor shall be considered as proving: it is *prima facie* evidence of fraud. This bankrupt, after receiving $1,568 from what he testifies were ordinary retail sales in the month of November, paid for borrowed money, as he alleges, to relatives and other friends, $3,300. This clearly establishes the fact that he was attempting to prevent his property from going into the hands of his assignee for distribution under the bankrupt act, for that was the result of his acts, and he is presumed to have intended that result. He wholly fails to account for $3,400 of the money which came into his hands. When he is asked what disposition he had made of his assets, he can only account for one-half. This stock, which had not been paid

for, belonged in equity to the sellers, and the proceeds of it ought in justice to be paid to them.

The evidence shows that Dans made these sales for two purposes: (1) To pay creditors whom he favored, (there being no proof that they were not creditors;) and (2) to defeat the provisions of the bankrupt act, and to prevent his property from coming to his assignee in bankruptcy.

The only real question in the case is, did Quinn know that these sales were made for such illegal purposes? The very fact that these sales were made out of the ordinary course of business of the seller was *prima facie* evidence of fraud. On this point the testimony of the defendant is in the record. Quinn paid $1,100 for this purchase. He had been in the habit of buying goods from Dans, and prior to November, 1877, his purchases ranged from $4 to $24 per month. Being in the habit of buying goods from Dans, he knew the nature of Dans' business. He himself was doing business, partly in the same line, in the same town. To say that he did not know the nature of Dans' business would be to shut our eyes to the plain facts in evidence. Quinn's entire stock was worth about $1,000. His entire sales from groceries and all his merchandise amounted, according to his testimony, to about $600 per month. Yet he buys goods from Dans at one purchase worth $1,100. The law declares what this establishes. Quinn says that he did not know that Dans was acting in contemplation of insolvency, or with any design to hinder or impede the operation of the bankrupt act; but the law says that he *did* know; that when he bought of a small retail dealer a large amount of goods at wholesale, that fact conveyed knowledge to him of the illegal purposes set forth in the bankrupt act, (Rev. St. § 5130.) If he could show that he inquired of Dans what was the object of the sale, and Dans had told him that it was to raise money to pay these debts, it might relieve him. But he shut his eyes, hoping to make a profit and a speculation out of the purchase. Quinn may not have been interested in defrauding Dans' creditors, but he was aiding Dans in so doing, and he must take the consequences.

In the case against Dub there is no doubt that he knew the nature of Dans' business. He was an old friend and an intimate acquaintance of the bankrupt. He bought goods of the value of $2,200, when by his own testimony $600 to $700 would fully stock the small establishment connected with his hotel where he was selling these goods.

In the case against Kahn the evidence also is that he was an old friend and knew the nature of Dans' business. In 1867 he gave in his entire stock for taxes at $1,000, yet his purchase from Dub at one transaction amounted to $1,926. His denial that he knew that Dans was acting with intent to work a fraud on the bankrupt law amounts to nothing. He should have shown that he made inquiry, and that he became satisfied that Dans' purpose was not the purpose which the law declared it, *prima facie*, to be.

The decree must, therefore, be against the defendants for the full amount of the value of the goods bought by them.

ERSKINE, D. J., *concurring.*