JAMES D. MAXWELL, TRUSTEE *vs.* DELBERT W. ADAMS.

Kennebec.    Opinion May 5, 1931.

*Maurice E. Rosen*, for plaintiff.
*Cook, Hutchinson, Pierce & Connell,*
*Perkins & Weeks*, for defendant.

SITTING: PATTANGALL, C. J., DUNN, STURGIS, BARNES, FARRING-
TON, THAXTER, JJ.

THAXTER, J.   This case is before us on exceptions by the plain-
tiff to the admission and exclusion of certain evidence and on a
general motion for a new trial. We shall consider only the motion.
The declaration is the common omnibus count, but is restricted by
the specification to an allegation for money had and received. The
plaintiff is the trustee in bankruptcy of E. C. Nichols Dry Goods
Co., and has brought this action to recover the sum of $13,438.41,
which he claims was paid improperly and without authority by the
bankrupt to the defendant just prior to bankruptcy. The case was
submitted to the jury, and there was a verdict for the defendant.

The bankrupt was a corporation engaged in business in Bangor.

Its sole stockholder was a man by the name of William E. Quirin, who was its president and treasurer. He had been for many years a close personal friend of the defendant Adams, who ran a similar business in Augusta. Adams had at times loaned Quirin money, had bought goods from him, and sold to him. In October, 1928, Adams learned from Quirin that he was planning to close out his business, and bought some of the fixtures, which had been used by the Nichols Co. in carrying on its business. These, he states, he bought from Quirin, because Quirin told him that they belonged to him personally. Sometime in the latter part of November, 1928, Quirin called Adams on the telephone, and asked him if he would be willing to send to Quirin's wife checks for $13,000 if Quirin should send them to him. Without asking for or receiving any explanation for this unusual request Adams agreed, believing, as he says, that the transaction was an entirely proper one. On November 28 he received two certified checks of the E. C. Nichols Dry Goods Co., payable to his order, one for $426.40 and the other for $6,500. Accompanying these was a memorandum addressed to Adams, stating that they were in payment of $6,500 on principal and $426.40 for interest. Adams deposited these checks to his personal account, drew his own check to the order of Quirin's wife for $6,926.40, and forwarded it to her at Manchester, New Hampshire. On December 10 he received from Quirin another certified check of the Nichols Company for $6,511.91, which he likewise deposited to his own account and forwarded his check to Quirin's wife for a like amount. At the time of the receipt of these checks by Adams the Nichols Co. owed him nothing. In January, 1929, the Nichols Company went into bankruptcy, and the plaintiff was appointed trustee. He has brought this action to recover back the payments made to Adams, apparently on the ground that they were fraudulent as to creditors. There is no evidence in the record that Adams in any way profited by the transaction.

The plaintiff's action is one for money had and received. This is a comprehensive action founded on equitable principles, and ordinarily lies, when one person has in his possession money, which in equity and good conscience belongs to another. *Webb* v. *Brannen*, 128 Me., 287 ; *Eldridge* v. *May*, 129 Me., 112. The action can likewise be maintained, even though the defendant does not actually

have the money in his possession, if, having had it, he has paid it out with knowledge of the plaintiff's right to it. *Hindmarch* v. *Hoffman*, 127 Pa., 284.

If the plaintiff is to recover in this case, he has the burden of establishing two propositions, first that the payment made by the Nichols Company to Grace H. Quirin was a fraud on its creditors, which the trustee in bankruptcy would have a right to recover back from her, and secondly that the defendant Adams, who participated in the transfer of the money, had notice of the fraudulent nature of the transaction.

The principle involved in this case is quite different from that enunciated in *Gilman* v. *F. O. Bailey Carriage Co., Inc.*, 125 Me., 108; *Boyle* v. *Lewiston Trust Co.*, 126 Me., 74, and in *American Lumber Sales Co.* v. *Fidelity Trust Co.*, 127 Me., 65. These cases hold that one, receiving a corporation check or note from a corporate officer payable to his own order and appropriated by him to his own uses, is chargeable with notice of his want of authority to issue the check or note for such purpose. In the case at bar the authority to issue the check is not in issue. The question is whether the payment to Mrs. Quirin was made to hinder, to delay, or to defraud creditors, and whether the defendant had notice of that fact. The case is analogous to that of *Boyle* v. *Clukey*, 126 Me., 443, in which this court held that the mere fact that a deed of a corporation conveyed property to its treasurer, which he in turn conveyed to a bank as security for a loan, was not alone sufficient to give notice to the bank that the conveyance was fraudulent as to creditors. It was merely evidence which, coupled with other circumstances, might be sufficient.

This case is before us on a general motion for a new trial. The only question therefore which we have to consider is, has the plaintiff so clearly sustained the burden of proving that the payment to Mrs. Quirin was fraudulent and that the defendant had notice of its character, that a verdict for the defendant is manifestly wrong.

Fraud is not to be presumed, but must be proved; and it is usually said that such proof should be clear, full, and convincing. *Frost* v. *Walls*, 93 Me., 405; *Grant* v. *Ward*, 64 Me., 239. This maxim does not, however, mean that in an action based on fraud

we can not as in other instances draw inferences from known or admitted facts. *State* v. *Kimball*, 50 Me., 409, 420. If it were not so, it would seldom be possible to establish fraud at all, for the proof of it ordinarily lies in circumstantial evidence. The intent with which an act is done is ordinarily the material factor. That is not customarily evidenced, certainly where the purpose is fraudulent or unlawful, by an open avowal of it; but can only be deduced from acts and circumstances. When, not one but several of these, all point in one direction their force is often compelling. *Ingersoll* v. *Barker*, 21 Me., 474.

In the case which is now before us what circumstances are there which show us Quirin's purpose in making this payment of more than $13,000 from the treasury of his company? The payment was made secretly; it was made on the eve of bankruptcy; it was made to his wife; and it was made entirely out of the usual course of business. Each one of these evidentiary facts points the finger of suspicion at the transaction; all of them unexplained are conclusive evidence of fraud. Such has been the consistent holding of courts from earliest times.

In *Tuynes Case*, 3 Coke, 80 b, decided two hundred and fifty years ago, we find the following language: "And therefore Reader, when any gift shall be made to you in satisfaction of a debt by one who is indebted to others also; 1. Let it be made in publick manner, and before the neighbors, and not in private, for secrecy is a mark of fraud."

See to the same effect 27 Corpus Juris, 494.

Transactions, which are legitimate, are not ordinarily conducted out of the usual routine of business. When a circuitous course is followed to do that which customarily would be done openly as an ordinary business affair, we are justified in asking for an explanation. The Maine Insolvent Law was but declaring a common law doctrine, when it provided that a transfer made out of the usual course of business was *prima facie* fraudulent. *Mathews* v. *Riggs*, 80 Me., 107.

In the words of the United States Supreme Court such a transaction "is *prima facie* evidence of fraud, and throws the burden of proof on the purchaser to sustain the validity of his purchase." *Walbrun* v. *Babbitt*, 16 Wall., 577, 581.

See also *Nisbet* v. *Quinn*, 7 Fed., 760 ; 32 L. R. A., note page 58 ; 12 R. C. L., 542.

It is true that proper and legitimate business transactions take place between husbands and wives. With changes in social and economic conditions, we are perhaps more likely to see such today than in the past. A transfer of property from one to the other without more carries with it no implication of fraud. *Grant* v. *Ward*, 64 Me., 239. When, however, such a transaction is made under unusual conditions, for no apparent object, or by a man in failing circumstances or on the eve of bankruptcy, it will be carefully scrutinized and may require an explanation by the parties.

In *Robinson* v. *Clark*, 76 Me., 493, we find the following language at page 494 with reference to a conveyance by a husband to a wife: "Transactions of this kind between husband and wife are to be closely scanned. There are between them unusual facilities for fraud. The absorption by her of his property, against the right of existing creditors, is not allowed."

In *Woodbridge* v. *Tilton*, 84 Me., 92, the court said, page 95: "Conveyances from husband to wife are to be closely scanned when the rights of his creditors are concerned."

In *Phinney* v. *Holt*, 50 Me., 570, 575, Judge Walton uses the following language: "When it can be shown that a party has disposed of *all* his attachable property, some progress has been made in establishing such a fraud. If in addition to this it can be shown that it has been disposed of to a relative, the evidence is strengthened, for experience shows that such transfers are oftener made to relatives than strangers."

That the language in these cases from our own jurisdiction is but an expression of a doctrine universally adopted can be seen by a glance at the following authorities. *Bank of Colfax* v. *Richardson*, 34 Ore., 518 ; *Butler* v. *Thompson*, 45 W. Va., 660 ; *Burt* v. *Timmons*, 29 W. Va., 441 ; *Kansas Moline Plow Co.* v. *Sherman*, 3 Okla., 204 ; *Flint* v. *Chaloupka*, 78 Neb., 594 ; *Kaine* v. *Weigley*, 22 Pa., 179. See also the cases cited in the note, 90 Am. State Rep., 500.

When a plaintiff, who is seeking to set aside a transfer as fraudulent, proves that it was made by a debtor on the eve of bankruptcy, that it involved a payment of money to a near relative, that it was

made secretly or in an underhanded way, he has made out a *prima facie* case. He does not have to go farther and prove that no consideration in fact passed. Under such circumstances the burden of establishing good faith, of overcoming the presumption of such evidence, is on a defendant who was a participant in the affair.

In the case of *Page* v. *Smith*, 25 Me., 256, the defendant was charged as trustee under a provision of the statute which provided that "if any person, summoned as trustee, shall have in his possession any goods, effects or credits of the principal defendant, which he holds under a conveyance that is fraudulent and void, as to the creditors of the defendant, he may be adjudged a trustee on account of such goods, effects or credits." The evidence showed a conveyance by a man in embarrassed circumstances to his brother, the defendant, who claimed that the conveyance was for a valuable consideration. The court held that it was the defendant's duty to have put his brother on the stand to explain the transaction, and that having failed to do so, he did not overcome the *prima facie* case made out by the plaintiff. The court said, page 266: "These circumstances present a case so unlike any thing that would ordinarily occur in a *bona fide* transaction, that, to say the least of it, should excite strong suspicions of fraud. And when such is the case, if the party implicated be in fact innocent, and has the means of making his innocence appear quite within his power, and does not do it, it is but reasonable, that the conclusion should be against him."

*Seavey* v. *Seavey*, 114 Me., 14, is a case of an attempt to hold the defendant as trustee under a similar statute to that discussed in *Page* v. *Shaw*, supra. The court said, page 16: "But when one summoned as trustee attempts to account for money, admittedly received from the defendant, as a payment on account of indebtedness, we think he is bound, if inquired of on examination, to make a full, direct and explicit disclosure of the character and amount of the claimed indebtedness, in order that the court may be able to judge whether the relation of debtor and creditor actually existed, and, if so, the extent of the indebtedness. Doubtful, indefinite and sweeping statements do not satisfactorily supply the omission of details and particulars."

In *Rollins* v. *Mooers*, 25 Me., 192, the question was whether a

conveyance was fraudulent as to creditors. The court said, pages 199-200 : "But it is insisted, on the part of the defendant, that the deed to Smith and Getchell was fraudulent and void as against those creditors. It appears that their debts accrued before that deed was made; that the plaintiff was then greatly embarrassed, and indeed insolvent; it was a conveyance of all his real estate, so far as appears, whereby his creditors might be defrauded; it was to two individuals, neither of whom, so far as appears, wanted the estate for his own occupation; and both were his sons-in-law; and he was permitted to continue his occupation afterwards as before. These circumstances are recognized as badges of fraud. Newland on Contracts, 372; *Jackson* v. *Mather*, 7 Cowen, 301 ; *Gunn* v. *Butler*, 18 Pick., 248. By the agreement of the parties we are authorized to draw such inferences from the facts proved and legally admissible as a jury might. From this evidence a jury, in the absence of any proof on the part of the plaintiff of the payment of the consideration expressed in the deed, would be legally authorized to infer that the conveyance, as against those creditors, was fraudulent."

Where there are facts such as are disclosed in the case at bar, indicating that a fraudulent transaction has taken place, there is no injustice in demanding that those who participated in it should establish that it was in fact *bona fide*. As was said by the court in *Kaine* v. *Weigley*, supra : "It is no hardship upon an honest man to require a reasonable explanation of every suspicious circumstance, and rogues are not entitled to a veto upon the means employed for their detection."

To the same effect as the above authorities illustrating the burden on the defendant are the following: *Bank of Colfax* v. *Richardson*, supra ; *Butler* v. *Thompson*, supra ; *Burt* v. *Timmons*, supra ; *Flint* v. *Chaloupka*, supra ; *Linn* v. *Brown*, 182 Ky., 166, 171 ; *Trice* v. *Rose*, 79 Ga., 75 ; *Riker* v. *Gwynne*, 113 N. Y. S., 404 ; *Winslow* v. *Staab*, 233 Fed., 305.

There is no dispute that the payment by Quirin to his wife through the medium of the defendant was made on the eve of bankruptcy. It seems clear that the method employed was for the purpose of concealment. In the absence of any evidence that the intent was to discharge an indebtedness from the corporation to her, it must be held to have been in fraud of creditors. Adams was an

active participant in transmitting the corporation's money to Mrs. Quirin. The question is did he have notice of the fraudulent nature of the transaction.

The defendant is a man of large experience in business affairs. When Quirin called him up and asked him to transmit the money, Adams never inquired of him the reason for this strange request. He received no explanation and asked for none. The same suspicions that come to the mind of an outsider must have been present to him. What other possible conclusion could be drawn from this strange proceeding than that Quirin was endeavoring to conceal the ultimate destination of these funds from someone entitled to know about them? A favor of this kind, which is nothing more nor less than a substitution of one person's check for that of another, might be asked by one friend of another, if he wished to conceal from the recipient the source from which the payment came. This obviously was not the situation here. Such an arrangement might be made because of a temporary shortage of funds to meet the first person's checks; but clearly Adams knew that such was not the fact, for the checks of the corporation payable to his order were certified. Furthermore, a memorandum came with the first remittance addressed to Adams indicating that it was in payment of a note. Adams held no note of the corporation. How does he explain this circumstance, which clearly indicates an attempt to deceive someone? He merely says that he didn't see it.

Adams admits that he was taken in, that he was a dupe of a personal and business friend. How does he account for his credulity? He says that it never occurred to him for an instant that the Nichols Company was not in a solvent and sound condition. Yet he knew that Quirin was the owner of it, to whom he had lent money but a short time before with which to make a settlement with his creditors. He knew that Quirin was closing out the business; and he had himself bought some of the fixtures. He had sent merchandise to Quirin's company not on a sale so that the relation of debtor and creditor arose between them, but on consignment to enable him to repossess the property in case of trouble. Beside the suspicion, which should have been aroused by the knowledge that Quirin by a circuitous route was sending corporate funds to his wife, the defendant had knowledge of facts, which caused him to

hesitate about extending credit to Quirin's company. Adams says that Miss Pomeroy, an honest employee of the Nichols Company, who issued the checks, suspected nothing wrong. The testimony indicates that this is true; but there is no evidence that Miss Pomeroy knew the important fact, which Adams knew, that this money was eventually to be paid to Mrs. Quirin. The circuitous method of payment may well have been adopted to conceal the true facts from her as well as from creditors.

Two other contentions of the defendant should be considered. He claims that there is evidence to show that Mrs. Quirin was a creditor of the corporation, and that this payment was to discharge that debt. The only testimony supporting such contention is from an accountant who testified that he believed that Mrs. Quirin held notes of the company for a considerable amount. We are left completely in the dark, if there were any indebtedness, as to the amount of it, and whether it was in fact outstanding at the time of the payments to her. Vague testimony of this kind does not meet the requirement laid down by Chief Justice Savage in *Seavey* v. *Seavey*, supra, that there should be "a full, direct and explicit disclosure of the character and amount of the claimed indebtedness." Furthermore there is no evidence in the case that Adams knew of any indebtedness owed by the bankrupt company to Mrs. Quirin. Counsel for the defendant further contend that the admitted facts — the insolvency of the company, and the method of payment to Mrs. Quirin — were consistent with an attempt merely to give Mrs. Quirin a preference. We construe such circumstances rather as evidence of a fraudulent payment than as indicating an attempt to prefer a *bona fide* creditor. Had it been a preference there was no need of concealment, for such a payment, under the provisions of the National Bankruptcy Act, could only be recovered back from the creditor if she had reasonable cause to believe that its effect was to give her a preference. Under such circumstances one obvious consequence of the attempt at concealment would have been to have charged her with notice of its preferential character and to have injured her chances of retaining it.

We can not ignore the fact that the defendant at the bankruptcy hearing at Bangor, when called on for an explanation of his receipt of the corporation checks and of his transmittal of the money

to Mrs. Quirin, refused to answer, because as he said his answer might have incriminated him. We feel that this is significant of a state of mind. Excuses are offered because of his inexperience in court procedure, because he acted on advice of counsel; but neither inexperience, confusion, nor counsel's advice can account for an innocent man's willingness to take refuge behind such a defense.

There is no rational explanation of the defendant's conduct. Counsel practically concede this when they say in their brief that "Adams very apparently was as innocent as a newborn babe and acted perhaps with as little wisdom as might a child of tender years." Such an admission hardly constitutes a defense. In the law of negligence we have a somewhat analogous situation. A person is required under certain circumstances to look and to listen or he will be held negligent. He must, however, look and listen not only with eyes and ears but with mind as well, and will be held accountable for a failure to see that which is perfectly obvious. So here the defendant's mere assertion of honest intent, his admission that he failed to use his faculties to discern that which was clear to the veriest novice in business affairs, can not save him from liability.

We reaffirm the doctrine, so often expressed by this court, that on a general motion a jury's verdict will not be set aside unless manifestly wrong or the result of bias or prejudice. *Hatch v. Dutch*, 113 Me., 405, 411. We feel here that it is manifestly wrong. Quite possibly the jury were influenced by the fact that the defendant admittedly received no profit from the transaction.

*Motion sustained.*
*New trial granted.*