**SPRINGFIELD LAND AND DE-VELOPMENT COMPANY, et al., Respondents,**

v.

**Bill J. BASS and Sandra Byrd, Appellants.**

**No. 23721.**

Missouri Court of Appeals, Southern District, Division Two.

June 14, 2001.

Richard E. Walters & Harold F. Glass, Millington, Glass & Walters, Springfield, for Appellant.

Randy J. Reichard, Lowther, Johnwon, Joyner, Lowther, Cully & Housely, LLC, Springfield, for Respondent.

BARNEY, Chief Justice.

Appellants Bill J. Bass ("Bass") and Sandra Byrd ("Byrd") appeal from an adverse judgment of the Circuit Court of Greene County which granted an award of $66,925.33, together with interest of $44,170.72 and attorney fees in the amount of $20,000.00 in favor of Springfield Land and Development Company and associated corporations and partners ("Springfield Land").[1] Appellants raise seven points of trial court error, discussed *infra*.

On review of a court-tried case, we sustain the judgment of the trial court unless there is no substantial evidence to support it, it is against the weight of the evidence, it erroneously declares the law, or it erroneously applies the law. *Unlimited Equip. Lines v. Graphic Arts*, 889 S.W.2d 926, 932 (Mo.App.1994)(quoting *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976)). "We defer to the factual findings of the trial judge, who is in a superior position to assess credibility." *Id.* "However, we independently evaluate the court's conclusions of law." *Id.*

---

1. John A. Heitz, Inc., a Missouri Corporation; Craig F. Lowther; Jeffrey Hutchens; Larry Lipscomb; Gillenwaters & Company, Inc.; Robert L. Price; O'Reilly Investment Company, a Missouri General Partnership consisting of David O'Reilly, Larry O'Reilly, Charles O'Reilly, Pam O'Reilly, Nancy O'Reilly, and Mary Beth O'Reilly, as its partners; Bill Beall Company, a Missouri Corporation; and Bruce Swisshelm.

The case arises out of a dispute relating to ownership of the residue of an escrow account held by Fidelity National Title Company ("Fidelity Title"), successor in interest to American Title Insurance Company, as escrow agent. As further explained, the necessity for the escrow account arose in conjunction with the sale of real property being administered in the Estate of Thelma Fenley, deceased ("the Estate").

The record shows that on February 8, 1988, appellant Bill Bass, in his capacity as personal representative of the Estate entered into a Real Estate Purchase Agreement ("Purchase Agreement") with William C. Beall, Jr., Jo Nell Beall and John A. Heitz ("Purchasers") for the sale of 55.9 acres of land located at the southeast corner of Campbell Street and Plainview Road in Springfield, Greene County, Missouri. The purchase price was $22,500.00 per acre.

The Purchase Agreement was contingent on Purchasers "determining that [a] sanitary sewer can be extended to the property at a reasonable cost" including appropriate rezoning. Initial cost projections were $200,000.00 to $210,000.00, a cost unsatisfactory to Purchasers. As a result, Purchasers and the Estate, through its personal representative, Bass, entered into an Amended Real Estate Purchase Agreement ("Contractual Amendment") on or about September 22, 1988, providing for the sharing of the costs of constructing the sewer to the property and for the sharing of reimbursements from expected connecting fees to the sanitary sewer line that became payable by third parties. At the time that the Contractual Amendment was entered into, the City of Springfield ("City") was requiring Purchasers to run the contemplated sanitary sewer line in a direction north of the subject real property. The Purchasers, the Estate and Fidelity Title's predecessor in interest entered into an escrow agreement ("Escrow Agreement") providing that the Estate would pay one-half of the cost of the construction of the sanitary sewer line to the real estate in an amount no greater than $100,000.00. It was also agreed that the escrow agent would hold these funds, subject to disbursal upon joint agreement, in writing, by the primary parties.

Subsequently, Purchasers assigned all of their interest in the Purchase Agreement, the Contract Amendment, and the Escrow Agreement to Springfield Land. During October of 1988, the Purchase Agreement was closed and title to the 55.9 acres was conveyed to Springfield Land. Final settlement of the Estate was approved by the probate court on June 28, 1989, and the probate court entered its findings and orders discharging the personal representative, Bass, on September 6, 1989.[2]

The record shows that, ultimately, City was unable to procure the necessary right-of-ways that were needed to run the contemplated sanitary sewer line in a northerly direction from the real estate. The City Council also defeated a bill to authorize City to exercise the power of eminent domain to take the right-of-ways for the northern sanitary sewer route. Nevertheless, shortly thereafter, City established a new sanitary sewer district which allowed the contemplated sanitary sewer line to run to the south of the subject real property. The south-route sanitary sewer line was subsequently completed in May of 1992, at an approximate cost of

2. No recognition was given to any interest of the heirs of Thelma Fenley in the escrow account, either in the final settlement filed by the personal representative or in the finding and order of discharge of the probate court.

$245,000.00. By this time the Estate had been closed almost three years.

On October 14, 1992, William C. Beall, Jr. ("Beall") sent a letter to Bass setting forth the costs of construction of the south sanitary sewer line and demanded payment of $72,764.15 from the escrow account, after crediting Estate for certain income and expenditures expended by the escrow agent. Later Beall discussed the matter at a meeting in which Bass's daughter, Byrd, was in attendance and renewed his request.[3] Byrd replied that the Estate was entitled to all of the monies that the personal representative of the Estate had placed in the original escrow account, and becoming angered, left the meeting. The matter laid in limbo for almost five years when on July 7, 1997, Byrd wrote Fidelity Title requesting the disbursal of the entirety of the escrow account to the Estate. In her letter, she informed Fidelity that the sewer was not going to be built "per Bill Beall." On July 23, 1997, Fidelity Title disbursed a check payable to the "Fenley Estate" in the amount of $100,322.95, which check was received by Byrd. The check was cashed by Byrd and the funds were, in turn, distributed to the original heirs or their successors of the original Estate in the same proportion as each had in the Estate. Bass received $17,218.93; Byrd received nothing.

In October 1998, Springfield Land filed suit against Bass and Byrd in their individual capacities. Springfield Land went to trial on its "Fourth Amended Suit for Declaratory Judgment and Damages" claiming four counts for breach of contract, fraud, conversion, and money had and re-

ceived. Bass did not appear during the trial due to his illness.

Extensive stipulations were entered into by the parties and the trial court made findings of facts and conclusions of law. The most pertinent of these findings for purposes of our review were findings numbered 23 and 29, set out as follows:

### # 23

That Defendant Sandra Byrd did admit in open court that she was acting as an agent of Bill J. Bass, Personal Representative of Estate, and for, and on behalf of, the Thelma Finley [sic] Estate, which was still filing tax returns in the year 1997 when she requested the balance of the escrow funds from Fidelity National Title Insurance Company.

### # 29

That the Plaintiffs had previously made demand to John Lewis, attorney for the Estate, for payment of the escrowed monies on January 8, 1993, and the court hereby finds that demand was made on January 8, 1993 for the escrowed funds.

In its conclusions of law the trial court determined, *inter alia*, that:

### # 35

Defendant Bill Bass by his actions and conduct in obtaining the funds from the escrow account did adopt and ratify the Contract and Amendment and Escrow Agreement so as to become bound thereby, and having now received the benefits thereunder, said Defendant are [sic] estopped from claiming that he was not a party to said agreements.

**3.** The record shows that in 1991 Bass had suffered a debilitating illness and thereafter, according to Byrd, she began "acting for Bill Bass, the personal representative of the es-
tate." It should be recalled at this point that the probate estate, of course, had been closed since 1989.

# 36

Defendant Bill Bass breached the Contract Amendment by failing to pay his share of the cost of construction of the sewer line in accordance with the Amendment.

As previously set out, the trial court awarded Springfield Land a money judgment in the amount of $66,925.33, "together with interest thereon from and after January 8, 1993, at the rate of 9 percent per annum in the amount of $44,170.72, and attorney fees in the amount of $20,000.00." This appeal followed.

The resolution of this appeal primarily centers around Bass and Byrd's first point in which they attack the trial court's judgment that Bass was liable to Springfield Land for breach of contract. Bass and Byrd maintain that Bass signed the Purchase Agreement, the Contract Amendment, and the Escrow Agreement only in his capacity as personal representative of the Estate and, therefore, was not personally bound under the terms of these three agreements. They also maintain that Bass never obtained any "benefits of the contract"—aside from his legitimate share as an heir of the Estate—because the funds from the escrow account obtained by Byrd ultimately were distributed to the heirs or successors of the Estate. In support, Bass and Byrd, *inter alia,* direct this Court to *Headrick Outdoor, Inc. v. Middendorf,* 907 S.W.2d 297, 300 (Mo.App.1995) and *General Elec. Capital Corp. v. Rauch,* 970 S.W.2d 348, 356 (Mo.App.1998), for the proposition that an individual who signs a contract in a representative capacity will not be bound personally, except upon clear and explicit evidence of an intention to be bound. On the other hand, Springfield Land counters that Bass, in his *individual* capacity, "ratified and adopted" the contracts in question because he accepted the benefits of the contracts when his *agent,*

Byrd, obtained the escrow funds from Fidelity Title.

■ We initially observe that at the time Byrd obtained the escrow funds from Fidelity Title in 1997, the Estate had terminated some eight years earlier and that Bass, the personal representative, had been discharged. "Upon the filing of receipts or other evidence satisfactory to the court that distribution has been made as ordered in the final decree, the court shall enter an order of discharge." § 473.660, RSMo 1986. "The discharge so obtained operates as a release from the duties of personal representative...." *Id.* Accordingly, a personal representative who has made final settlement and has been discharged has no authority to represent or act for the estate of his decedent. *See State ex rel. Blythe v. Trimble,* 302 Mo. 699, 706, 258 S.W. 1013, 1015 (1923). Therefore, at the time that Byrd, the purported agent of the purported personal representative (Bass), obtained the escrow funds in question and distributed them to the original heirs of the Estate, Bass had no authority to act as personal representative. Consequently, neither Bass nor Byrd could have "ratified" or "adopted" the extant Contract Agreement or Escrow Agreement on behalf of the discharged personal representative or the non-existent estate. *See id.* Accordingly, the question is whether Bass was individually bound by Byrd's actions in obtaining the escrow funds from Fidelity Title such as to support a judgment based on breach of the Contract Amendment and Escrow Agreement. The answer to this question depends on whether the trial court was correct in its conclusions of law that Bass, through Byrd, had ratified and/or adopted the Contract Amendment and Escrow Agreement in his individual capacity.

■ In our review, we observe that the doctrine of "ratification" has diverse defini-

tions, meanings and applications depending on the factual context in which it is used. In contract law, "ratification" has been described as "an act by which an otherwise voidable and, as a result, invalid contract is conformed, and thereby made valid and enforceable." 17A C.J.S. *Contracts* § 138 (1998). In this connection, the doctrine is often used in cases involving elements of either fraud, duress, undue influence, innocent misrepresentation, mistake, or mental incompetence. *Id.; see also* RESTATEMENT OF THE LAW, *Contracts* 2d, § 380, comment "a." (Ratification by Affirmance). None of these situations apply to the case at hand. There was no voidable contract made among Bass and Byrd in their individual capacities and Springfield Land that could have been conformed by Bass's and Byrd's actions. *See* 17A C.J.S. *Contracts* § 137 (1999). The existing contracts were originally entered into between the Estate through its then acting personal representative and Purchasers/Springfield Land. Indeed, the material component of the three contracts—the sale of the 55 acres—had been accomplished some eight years previously, when the Purchase Agreement was closed.

We also note that "[a]lthough it has been observed that in the literature of the law there has often been little disposition to distinguish between ratification and estoppel in *pais,* they are, nevertheless, distinguishable." 2A C.J.S. *Agency* § 64 (1972). "The substance of ratification, as distinguished from that of estoppel which is the inducement to another to act to his prejudice, is confirmation after conduct." *Id.; see also* 31 C.J.S. *Estoppel and Waiver* § 61 (1996). Here, estoppel clearly does not apply as there was no inducement by either Bass or Byrd for Springfield Land to act to its prejudice. Therefore, it is clear to us that the trial court, in its judgment, used the terms "ratifica-

tion/adoption" in the sense of ratification in agency. References to case law in Springfield Land's brief also cite to cases which recognize the principles of ratification in agency.

"Ratification in agency is an adoption or confirmation by one person of an act [such as entering into a contract] performed on his behalf by another without authority." 2A C.J.S. *Agency* § 63 (1972). As previously set out the "substance of the doctrine is confirmation after conduct, amounting to a substitute for prior authority." *Id.* This Court has written: "[a]s relates to agency, 'ratification' is an express or implied adoption or confirmation, with knowledge of all material matters, by one person of an act performed on his behalf by another who at that time assumed to act as his agent *but lacked authority to do so." Wilks v. Stone,* 339 S.W.2d 590, 595 (Mo.App.1960) (emphasis added); *Unlimited Equip. Lines,* 889 S.W.2d at 936; *American Multi–Cinema, Inc. v. Talayna's N.W., Inc.,* 848 S.W.2d 557, 559 (Mo.App.1993). Ratification proceeds upon the assumption that there has been no prior authority and merely constitutes a substitute therefore. *Brookfield Prod. Credit Ass'n v. Weisz,* 658 S.W.2d 897, 899 (Mo.App.1983). "The existence of agency and the authority of the agent can be and often is implied by proof of facts, circumstances, words, acts, and conduct of the party to be charged." *Wilks,* 339 S.W.2d at 595. "Probably the most certain evidence of implied ratification is the acceptance and retention of the fruits of the contract with full knowledge of the material facts of the transaction." *American Multi–Cinema,* 848 S.W.2d at 560 (quoting *Wilks,* 339 S.W.2d at 596).

The trial court premised its conclusion that Bass in his individual capacity had breached the Contract Amendment and Escrow Agreement on its findings that

Byrd acted as Bass's individual agent in taking control of the escrow funds, and that Bass received a ⅙ share of these funds. This premise is faulty for two reasons. First, to be valid, Byrd must have been serving as Bass's agent in his *individual* capacity. This conclusion is at war with the trial court's explicit finding (# 23) that "Sandra Byrd did admit in open court that she was acting as agent of Bill J. Bass, *Personal Representative of the Estate* ... when she requested the balance of the escrow funds...." (Emphasis added.) Furthermore, Byrd could not have acted as the agent of the personal representative of the Estate, because as previously set out, the Estate had been closed and the personal representative had been discharged. Second, even though Bass eventually received a ⅙ share of the escrow funds, the mere receipt of these funds does not in and of itself constitute a contract to later be ratified by Bass. What, then, was the agreement that the agent, Byrd, had entered into such as to bind Bass in his individual capacity? There was none. *See Great Southern Life Ins. Co. v. Dolan,* 262 S.W. 475, 477 (Tex.App.1924)("The principal may be estopped to deny the validity or binding effect of an unauthorized contract by its agent, but there must have been such a contract made before the estoppel can be invoked."); *Bliss v. Miller,* 119 Or. 573, 250 P. 763 (1926); 2A C.J.S. *Agency* § 67 (1972) ("there can be no ratification where nothing exists, or where nothing has been done, upon which the ratification can operate....").

■ The record is also devoid of a showing that either Bass or Byrd entered into a new contract in which either of them recognized the validity of the Contract Amendment and/or the Escrow Agreement. A 'meeting of the minds' is required to form a contract. *Dierker Assocs., D.C., P.C. v. Gillis,* 859 S.W.2d 737,

743 (Mo.App.1993). There certainly was no meeting of the minds among the parties when Byrd received the escrow funds from Fidelity Title contrary to the terms of the original Contract Amendment and Escrow Agreement.

While Springfield Land posits *Wiggins Ferry Co. v. Ohio & M. Ry. Co.,* 142 U.S. 396, 12 S.Ct. 188, 35 L.Ed. 1055 (1892), as support for their position, the factual scenario recited in that case is foreign to the case at hand. In *Wiggins,* a ferry company contracted with a railroad company to allow the latter the right to construct on and maintain land that the ferry company owned. The railroad company promised to use the ferry company to transport persons and property using the railroad's trains across the river serviced by the ferry company. *Id.* at 398–99, 12 S.Ct. 188. The railroad company went broke. A totally new and independent railway company took over the railroad company's assets, including those located on the ferry company's land, with the tacit consent of the ferry company without any special agreement and continued operations in the same manner as did the defunct railroad company. *Id.* Subsequently, the railway company diverted its freight from the ferry company to another competing ferry company. *Id.* at 400–01, 12 S.Ct. 188. In remanding the case to enable the ferry company to recover for "breach of contract," the *Wiggins* court determined that by its conduct the new railway company was considered in equity to have "adopted" the original contract between the ferry company and the defunct railroad company, such that the ferry company was entitled to compensation for the use of the property. *Id.* at 408–09, 12 S.Ct. 188.

We discern from our review of *Wiggins* that the court did not premise its opinion on the basis of ratification by agency or ratification by contract, but under equita-

ble principles of estoppel arising from the railway's use of the ferry company's land over a prolonged period of time. In the instant matter, neither Bass nor Byrd's actions involved the "use" of lands or property owned by Springfield Land over a prolonged period of time such that, equitably, neither could deny the existence of their on-going relationship. *Wiggins* does not aid Springfield Land.

Accordingly, we conclude that Bass did not ratify or adopt the Contract Agreement or Escrow Agreement in his individual capacity such as to be bound by its terms. Consequently, not being a party to these contracts so as to be individually bound thereby, Bass did not breach either the Contract Agreement or the Escrow Agreement. The trial court erred as a matter of law when it concluded otherwise. *Murphy,* 536 S.W.2d at 32. Point One has merit and is sustained.

 In Point Two, Appellants Bass and Byrd asseverate that in its petition Springfield Land did not plead a breach of the Contract Amendment or Escrow Agreement by Byrd such as to permit the trial court to impose a money judgment against her, individually, for such breach. Citing to *Clay v. Missouri Highway and Transp. Comm'n,* 951 S.W.2d 617, 631 (Mo.App.1997), they maintain that a party cannot recover for a claim not pled. We agree.

 Here, breach of contract by Byrd was not pled. "Courts have power to decide only those questions which are presented by the parties in their pleadings." *Sisk v. McIlroy and Associates,* 934 S.W.2d 567, 571 (Mo.App.1996). While Rule 55.33(b) permits the amendment of pleadings to conform to the evidence, in order for the evidence admitted without objection to amend the pleadings by impli-

cation or consent, that evidence must bear only on the new issue and not be relevant to an issue already in the case.[4] *Jefferson v. Bick,* 872 S.W.2d 115, 120 (Mo.App. 1994). The evidence that Springfield Land proffers in support of the judgment against Byrd, individually, for breach of contract, is probative of the claim made against Bass, e.g., that Byrd wrote Fidelity Title demanding the escrow funds from Fidelity Title; that she was aware of the contents of the Escrow Agreement and Contract Amendment; that she received a check from Fidelity Title for $100,322.94 and, in turn, distributed those funds to the heirs of the Estate or their successors. This evidence is undeniably relevant to other issues in the case. *Id.* Accordingly, the pleadings were not amended by implication or consent. *See Coleman v. Mantia,* 25 S.W.3d 675, 676–77 (Mo.App.2000). The trial court erred as a matter of law when it determined that Byrd had breached the two contracts in question. *Murphy,* 536 S.W.2d at 32. Point Two is sustained.

We turn now to the remaining points of trial court error posited by Bass and Byrd. We do not review Points III (asserting trial court error in basing its judgment on Count II for fraud) and IV (asserting trial court error in basing its judgment on Count III for conversion) because it is clear that the trial court's judgment was not bottomed on a finding of either fraud or conversion. The points, therefore, are moot. *See Bank of Washington v. McAuliffe,* 676 S.W.2d 483, 487 (Mo. banc 1984).

 In reviewing Bass and Byrd's fifth point, we note they argue that to the extent the trial court entered judgment against Byrd and Bass on the basis of Count IV, for money had and received, the judgment was erroneous. They maintain that there was no competent and substan-

---

**4.** Rule references are to Missouri Court Rules (2000).

tial evidence that they received the escrow funds because they maintain that Fidelity Title had given the money to the "Estate." We disagree.

Although we have determined that the trial court erred in premising an award of damages against Bass and Byrd on the basis of breach of contract, nevertheless, we are convinced that the record and the trial court's findings support Springfield Land's claim against Bass and Byrd under Count IV for money had and received. *See Alarcon v. Dickerson*, 719 S.W.2d 458, 461 (Mo.App.1986). "The appellate court is primarily concerned with the correctness of the trial court's result, not the route taken by the trial court to reach that result." *Business Men's Assur. Co. v. Graham*, 984 S.W.2d 501, 506 (Mo. banc 1999). "Thus, the judgment will be affirmed if cognizable under any theory, regardless of whether the reasons advanced by the trial court are wrong or not sufficient." *Id.* "An action for money had and received is a very broad and flexible action, which seeks to reach monies which in equity and good conscience ought not to be retained by the defendant but ought to be paid to plaintiff." *Alarcon*, 719 S.W.2d at 461. "It is a legal action, but based upon equitable principles." *Id.* "The tendency of the courts is to widen rather than restrict its scope." *Id.*

In the instant case, the trial court concluded that when the check for $100,322.95 was issued to the "Thelma Fenley Estate" by Fidelity Title, the escrow agent did so in contravention of the Escrow Agreement, which required the consent of the signators to the Contract Amendment and Escrow Agreement prior to disbursal.[5] Additionally, the trial court determined that

Springfield Land was entitled to the principal amount of $66,925.33 from the escrow funds as reimbursement for expenses expended in constructing the sanitary sewer, pursuant to the Amended Contract. The trial court also found that the escrow funds were ultimately distributed to the "heirs of the Thelma D. Fenley Estate in the same proportion as each had in the Thelma D. Fenley Estate."[6]

Our review of the record supports the foregoing findings by the trial court, together with the trial court's conclusion that Byrd (but not Bass) received into her hands the amount of $66,925.33. The record also supports the proposition that Byrd knew that Springfield Land claimed a portion of the escrow funds because of the construction of the sanitary sewer line and that such line had been constructed.

In her testimony, Ms. Peggy Snow, an employee of Fidelity Title, acknowledged having between "five and fifteen" conversations with Byrd regarding the escrow funds and the interest drawn on the funds. Ms. Snow stated that "[t]here were times when she [Byrd] wanted the principal balance of the escrow." In response, Ms. Snow testified that she told Byrd that "I would notify the other parties and if everyone was in agreement in writing that I would follow those instructions." Ms. Snow also testified that she had occasion to talk with Beall about releasing the escrow funds but that he "was not in agreement to release the funds." Additionally, Beall testified that he had had a conversation with Byrd concerning the "escrow moneys." He acknowledged that he went "over the history of the contract with her" and that he discussed the "history of the sewer and what the City wanted...."

---

**5.** Fidelity Title is not a party in this litigation, nor are the other five heirs of the Thelma D. Fenley Estate, or their successors.

**6.** Each of the six heirs or such heir's successor(s), as applicable, received $17,218.93.

Beall related that he told Byrd that he was entitled to the escrow funds but that Byrd told him "she was entitled to it." Lastly, Beall testified that at no time did he ever express to Byrd that the sanitary sewer line was not going to be built. He related that Springfield Land had spent over $200,000.00 in constructing the sewer line and opined that Byrd was lying when she represented to Fidelity Title that the sanitary sewer line was not going to be constructed.

In her testimony at trial, Byrd denied having conversations with Ms. Snow and demanding the "principal balance." She stated that she "didn't know anything about the sewer." However, in response to the question whether or not she "disbelieved" that the sanitary sewer line had been built, Byrd related that "I would assume not because there's a Dillons store there, and I would assume they couldn't put it in without a sewer." Furthermore, when questioned as to whether she knew "what was said or agreed upon between your dad and Bill Beall because you weren't there for the contract discussions or the discussions about the amendment," Byrd responded, "I have read the contract." Byrd also acknowledged that in her deposition testimony that she had testified that Beall had told her that he was entitled to part of the escrow funds. Additionally, responding to the question "[y]ou wanted Fidelity to believe the things you put into your letter, true?," Byrd replied, "I guess so."

While Byrd may have turned the money over to the heirs of the Estate or their successors, this latter action does not preclude her liability to Springfield Land under these circumstances. See *Maxwell v. Adams*, 130 Me. 230, 154 A. 904, 906 (1931) (action for money had and received "maintained even though the defendant does not actually have the money in his possession,

if having had it, he had paid it out with knowledge of the plaintiff's right to it."); *Cornet v. Boyle*, 116 Mo.App. 430, 92 S.W. 725, 727 (1906); see also *Tillman v. Bungenstock*, 185 Mo.App. 66, 171 S.W. 938, 939 (1914). In equity and good conscience, the $66,925.33 ought to be paid back to Springfield Land by Byrd. See *Alarcon*, 719 S.W.2d at 461–62. However, under the factual scenario reviewed, Bass is accountable to Springfield Land for the amount of money that he received: $17,218.93. See *Koontz v. Whitaker*, 111 S.W.2d 197, 200 (Mo.App.1937). Point denied.

 In Point Six, Bass and Byrd maintain that there was no substantial evidence to support an award of attorney's fees in favor of Springfield Land in the amount of $20,000.00. They further argue that if Springfield Land is entitled to recover attorney's fees such recovery arises either from statute or contract and both are inapplicable given the factual scenario in the instant case. We need not decide whether the award of attorney's fee to Springfield Land in the amount of $20,000.00 was based on substantial evidence before the trial court because we agree with Bass's and Byrd's contention that an award of attorney's fees was not warranted under the record presented.

 "Missouri has adopted the 'American Rule' which provides that litigants are to bear the expense of their own attorney's fees." *In re Morrison*, 987 S.W.2d 475, 478 (Mo.App.1999). "Attorney's fees may be recovered, however, if the situation falls within one of the following categories: (1) recovery pursuant to contract or provided by statute; (2) recovery as damages to a wronged party involved in collateral litigation; or (3) reimbursement ordered by a court of equity to balance benefits." *Id.* "The equitable balancing of benefits by awarding attorney's

fees occurs only if 'very unusual circumstances' can be shown." *Id.*

There is no statutory authorization to fees presented here. Although a contract action was pled and the trial court erroneously premised its judgment on a breach of contract, we have determined that Springfield Land is entitled to recover under their pled theory of money had and received. Any award of attorney's fees pursuant to a theory of money had and received is warranted only if very unusual circumstances can be shown, involving an unusual type of case or unusually complicated litigation, under very limited fact situations. *Morrison,* 987 S.W.2d at 478; *see DCW Enterprises Inc. v. Terre du Lac Ass'n,* 953 S.W.2d 127, 132 (Mo.App.1997); *Washington Univ. v. Royal Crown Bottling Co.,* 801 S.W.2d 458, 468–69 (Mo.App. 1990). Such was not the case in the instant matter. The award of attorney's fees was in error. *Murphy,* 536 S.W.2d at 32. This award is reversed. Point sustained.

Lastly, in Point Seven, Byrd and Bass complain that the trial court erred in awarding prejudgment interest in the amount of $44,170.72, based on nine percent interest on the principal amount of $66,925.33 from January 8, 1993—the date of Springfield Land's attorney's letter to the purported Estate's attorney.[7] Byrd and Bass argue that the record was devoid of a showing that Springfield Land had complied with the strict provisions of sec-

tion 408.040.2, requiring that a demand letter be sent by certified mail and "be left open for sixty days."[8] In this respect they are correct.

Additionally, although not specifically mentioning section 408.020, Byrd and Bass maintain that they were not parties to any contract with Springfield Land that provided for prejudgment interest. Springfield Land counters that the trial court based its award of prejudgment interest exclusively pursuant to the provisions of section 408.020 ("for all monies after they became due and payable, on written contracts . . . ."), and not on section 408.040.[9]

Section 408.020, in pertinent part, reads as follows:

Creditors shall be allowed to receive interest at the rate of nine percent per annum, when no other rate is agreed upon for all moneys after they become due and payable, on written contracts, and on accounts after they become due and demand of payment is made. . . .

§ 408.020. As a general rule, "[a]n award of prejudgment interest in a case where § 408.020 is applicable is not a matter of court discretion; it is compelled." *Huffstutter v. Michigan Mut. Ins. Co.,* 778 S.W.2d 391, 395 (Mo.App.1989). It is evident from our review of the trial court's judgment that the trial court premised its award of prejudgment interest on the basis

---

7. Again, recall that the Estate had been previously closed at the time Springfield Land's attorney wrote the demand letter. Our review of the record does not support the proposition that the Estate attorney continued in the employment of either Bass or Byrd thereafter.

8. All statutory references are to RSMo 1994, unless otherwise set out.

9. In their prayer under Count IV of their amended petition (money had and received),

Springfield Land requested "interest thereon and costs as allowed by law," and did not specify under which statutory authority they were requesting interest. "(A)n express allegation seeking prejudgment interest is not a prerequisite to an award of such interest." *Dierker Associates,* 859 S.W.2d at 746. "A petition which prays that the court grant 'such other relief as may be proper' is sufficient." *Id.*

of a claim arising from written contract, pursuant to section 408.020, as Springfield Land argues. We thus assume that the trial court believed that an award of interest pursuant to that statute was compelled. Since we have determined that Springfield Land is entitled to recover only under their pled theory of money had and received, an award of prejudgment interest arising from contract, pursuant to section 408.020, was not warranted.

 An action for money had and received is an action "based upon equitable principles." *Alarcon*, 719 S.W.2d at 461; *compare 21 West Inc., v. Meadowgreen Trails, Inc.*, 913 S.W.2d 858, 872 (Mo.App. 1995). "In equitable actions, the determination of whether to award prejudgment interest is left to the discretion of the trial court." *21 West Inc.*, 913 S.W.2d at 872. "[I]f the Court, in its discretion, awards interest, the rate of interest would be that set forth in § 408.020...." *Vogel v. Lake Timberline Prop. Owners*, 741 S.W.2d 869, 872 (Mo.App.1987). "This being a suit for money had and received, interest should be allowed from the time of demand." *Brink v. Kansas City*, 358 Mo. 845, 217 S.W.2d 507, 511 (1949). "[I]f no demand is made prior to the bringing of the action, the date the action was instituted is considered the time of demand." *21 West, Inc.*, 913 S.W.2d at 872.

Accordingly, we reverse that part of the trial court's judgment assessing prejudgment interest, pursuant to § 408.020, on the principal amount of $66,925.33 as and from January 8, 1993. Given the facts as set out in footnote 7, *supra*, in this case no legally recognized demand could have been made on January 8, 1993. Furthermore, we remand the matter back to the trial court for a determination consistent with this opinion whether there should be an award of prejudgment interest based upon the equitable principles of fairness and justice; and, if so, when the prejudgment interest may commence to run. *See Ins. Co. of North America v. Skyway Aviation, Inc.*, 828 S.W.2d 888, 892 (Mo.App.1992). Point sustained in part.

Pursuant to Rule 84.14, this Court modifies the trial court's judgment and finds that Appellants, Bill J. Bass and Sandra Byrd, are jointly and severally liable to Respondents in the amount of $17,218.93, and that Appellant, Sandra Byrd, is solely liable to Respondents for the remaining balance up to the sum of $66,925.33. Accordingly, Respondents are awarded such sums of money against the respective Appellants.

The trial court's award of prejudgment interest is reversed and remanded to the trial court for further action consistent with this opinion. The award of attorney's fees is reversed. In all other respects the judgment of the trial court is affirmed.

GARRISON, J., and RAHMEYER, J., concur.